## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

CIVIL NO. 11-____ **FILED**

APR 25 2011

Phil Lombardi, Clerk
U.S. DISTRICT COURT

**11 CV - 2 4 9 CVE   PJC**

**COMPLAINT**

DONALD KIMERY; NANCY KIMERY; T.K., by
and through Donald and Nancy Kimery; MARJORIE
BOYD-LYONS; G.B., by and through Marjorie
Boyd-Lyons; ALDO EAGLE; MICHELE EAGLE;
J.E., by and through Aldo and Michele Eagle;
STEFAN HIPSKIND; STEPHANIE HIPSKIND;
L.H., by and through Stefan and Stephanie Hipskind;
A.J.H., by and through Stefan and Stephanie
Hipskind; MIKE HOWARD; AMY HOWARD;
B.L.R., by and through Mike Howard and Amy
Howard; CURTIS JOHNSON; JANE JOHNSON;
W.J., by and through Curtis Johnson and Jane
Johnson; LAURA RIDDICK; K.R., by and through
Laura Riddick; JOE SERAFIN; BETH SERAFIN;
A.S., by and through Joe and Beth Serafin; JERRY
SNEED; SHANNA SNEED; B.S., by and through
Jerry and Shanna Sneed; RUSSELL SPRY;
STEPHANIE SPRY; G.S., by and through Russell
and Stephanie Spry; TIM TYLICKI; KIMBERLY
TYLICKI; M.T., by and through Tim and Kimberly
Tylicki,

*Plaintiffs,*

v.

BROKEN ARROW PUBLIC SCHOOLS; the
BOARD OF EDUCATION OF BROKEN ARROW
PUBLIC SCHOOLS; JAROD MENDENHALL, in
his official capacity as Superintendent of Broken
Arrow Public Schools; JENKS PUBLIC SCHOOLS;
the BOARD OF EDUCATION OF JENKS PUBLIC
SCHOOLS; JANE HEDRICK, in her official capacity
as Clerk of the Jenks Public Schools Board of
Education; KIRBY LEHMAN, in his official capacity
as Superintendent of Jenks Public Schools;
TULSA PUBLIC SCHOOLS; the BOARD OF
EDUCATION OF TULSA PUBLIC SCHOOLS;
PEGGY YOUNG, in her official capacity as Clerk of
the Tulsa Public Schools Board of Education; KEITH
BALLARD, in his official capacity as Superintendent
of Tulsa Public Schools; UNION PUBLIC

**JURY TRIAL DEMANDED**

John Thetford
*Counsel of Record*
Stipe, Harper, Laizure, Uselton,
Belote, Maxcey & Thetford
2417 E. Skelly Dr.
Tulsa, OK 74170

Eric Rassbach
(*pro hac vice* pending)
Meir Katz
(*pro hac vice* pending)
The Becket Fund for
 Religious Liberty
3000 K. St., NW, Ste. 220
Washington, DC 20007

*Attorneys for Plaintiffs*

1



SCHOOLS; the BOARD OF EDUCATION OF
UNION PUBLIC SCHOOLS; BEVERLY
THUMMEL, in her official capacity as Secretary to
the Union Public Schools Board of Education; KIRT
HARTZLER, in his official capacity as Associate
Superintendent of the Union Public Schools Board of
Education; and CATHY BURDEN, in her official
capacity as Superintendent of Union Public Schools,

*Defendants*.

Above-named Plaintiffs, by and through their attorneys, state as follows:

## NATURE OF ACTION

1. Plaintiffs are students with special needs and the parents of such students who reside within Defendant school districts. Under a recently enacted state law—the Lindsey Nicole Henry Scholarship for Students with Disabilities Program Act, OKLA. STAT. 70, § 13-101.1, *et seq.*, (commonly known as "H.B. 3393") (hereinafter "the Act")—Plaintiffs should receive state scholarships from Defendants that they can use to attend (or send their children to) a nonpublic school.

2. However, Defendants have refused, and have announced a policy of continuing to refuse, to comply with the Act based on their belief that the Act violates the Oklahoma Constitution. In particular, they claim that some of the nonpublic schools that might be attended by special needs children are "sectarian," and that the Act therefore violates the Oklahoma "Blaine Amendment."

3. Defendants have thus deprived Plaintiffs of the scholarships to which they are entitled under the Act. Plaintiffs seek damages, injunctive relief, and declaratory relief on the ground that Defendants' policy has violated and continues to violate their rights under the United States Constitution, federal civil rights laws, and Oklahoma state law.

2

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction over claims arising under the laws of the State of Oklahoma pursuant to 28 U.S.C. § 1367.

5.  Venue lies in this District pursuant to 28 U.S.C. § 1391(b). All Plaintiffs reside in this District. Defendants' principal places of business are located in this District. The events giving rise to this action occurred within this District.

## PARTIES

### A.    Plaintiffs

6.  Plaintiff Donald Kimery and Plaintiff Nancy Kimery are the parents of Plaintiff T.C., a minor. For many years, they have actively sought help from Defendant Broken Arrow Public Schools for T.K.'s special needs.

7.   Plaintiff Donald Kimery and Plaintiff Nancy Kimery have another child who is currently a student in the Broken Arrow Public Schools school system.

8.  Plaintiff T.K. spent all of last school year as a student in Defendant Broken Arrow Public Schools' school district. He currently lives within the geographic boundaries of Defendant Broken Arrow Public Schools' school district. He suffers from Asperger's syndrome, an anxiety disorder, a speech disorder, a sensory processing disorder, and other developmental issues. He has received an Individualized Education Program (IEP) from Defendant Broken Arrow Public Schools. He now attends Town & Country, a nonpublic school.

3

9. Plaintiff Majorie Boyd-Lyons is the mother of Plaintiff G.B., a minor. For many years, she has actively sought help from her school district Defendant Broken Arrow Public Schools for G.B.'s special needs.

10. Plaintiff Majorie Boyd-Lyons has another child who is currently a student in the Broken Arrow Public Schools school system.

11. Plaintiff G.B. spent all of last school year as a student in Defendant Broken Arrow Public Schools' school district. She currently lives within the geographic boundaries of Defendant Broken Arrow Public Schools' school district. She suffers from Attention-Deficit/Hyperactivity Disorder, Oppositional Defiant Disorder, and Obsessive-Compulsive Disorder, for which she has received an IEP from Defendant Broken Arrow Public Schools. She now attends Town & Country, a nonpublic school.

12. Plaintiff Aldo Eagle and Plaintiff Michele Eagle are the parents of Plaintiff J.E., a minor. For many years, they have actively sought help from Defendant Jenks Public Schools for J.E.'s special needs.

13. Plaintiff Aldo Eagle and Plaintiff Michele Eagle have another child who is currently a student in the Jenks Public Schools school system.

14. Plaintiff J.E. spent all of last school year as a student in Defendant Jenks Public Schools' school district. He currently lives within the geographic boundaries of Defendant Jenks Public Schools' school district. He suffers from autism, for which he has received an IEP from Jenks Public Schools. He now attends Town & Country, a nonpublic school.

15. Plaintiff Stefan Hipskind and Plaintiff Stephanie Hipskind are the parents of Plaintiff L.H., a minor, and of Plaintiff A.J.H., a minor. For many years, they have

4

actively sought help from Defendant Union Public Schools for L.H.'s special needs and for A.J.H.'s special needs.

16. Plaintiff Stefan Hipskind and Plaintiff Stephanie Hipskind have two other another children who are currently students in the Union Public Schools school system.

17. Plaintiff L.H. spent all of last school year as a student in Defendant Union Public Schools' school district. He currently lives within the geographic boundaries of Defendant Union Public Schools' school district. He suffers from a learning disability, for which he has received an IEP from Defendant Union Public Schools. He now attends Immanuel Christian Academy, a nonpublic religious school affiliated with Immanuel Lutheran Church.

18. Plaintiff A.J.H. spent all of last school year as a student in Defendant Union Public Schools' school district. He currently lives within the geographic boundaries of Defendant Union Public Schools' school district. He suffers from a learning disability, for which he has received an IEP from Defendant Union Public Schools. He now attends Immanuel Christian Academy, a nonpublic religious school affiliated with Immanuel Lutheran Church.

19. Plaintiff Amy Howard is the mother of Plaintiff B.L.R., a minor. Plaintiff Mike Howard is the husband of Amy Howard and legal guardian of Plaintiff B.L.R. For many years, they have actively sought help from Defendant Broken Arrow Public Schools for B.L.R.'s special needs.

20. Plaintiff Amy Howard and Plaintiff Mike Howard have another child who is currently a student in the Broken Arrow Public Schools school system. They have an additional child who is a graduate of Broken Arrow Public Schools.

5

21. Plaintiff B.L.R. spent all of last school year as a student in Defendant Broken Arrow Public Schools' school district. He currently lives within the geographic boundaries of Defendant Broken Public Schools' school district. He suffers from Asperger's syndrome, Attention-Deficit/Hyperactivity Disorder, and anxiety and mood disorders, for which he has received an IEP from Defendant Broken Arrow Public Schools. He now attends Town & Country, a nonpublic school.

22. Plaintiff Laura Riddick is the mother of Plaintiff K.R., a minor. For many years, see has actively sought help from her school district Defendant Tulsa Public Schools for K.R.'s special needs.

23. Plaintiff Laura Riddick has another child who is currently enrolled in Tulsa Public Schools. That child intends to attend college next year.

24. Plaintiff K.R. spent all of last school year as a student in Defendant Tulsa Public Schools' school district. She currently lives within the geographic boundaries of Defendant Tulsa Public Schools' school district. She suffers from dyslexia, for which she has received an IEP from Defendant Tulsa Public Schools. She now attends Town & Country, a nonpublic school.

25. Plaintiff Laura Riddick cannot afford to send K.R. to Town & Country at her expense and send her other child to college next year.

26. Plaintiff Joe Serafin and Plaintiff Beth Serafin are the parents of Plaintiff A.S., a minor. For many years, they have actively sought help from Defendant Broken Arrow Public Schools for A.S.'s special needs.

27. Plaintiff Joe Serafin and Plaintiff Beth Serafin have another child who is a graduate of Broken Arrow Public Schools.

28. Plaintiff A.S. spent all of last school year as a student in Defendant Broken Arrow Public Schools' school district. She currently lives within the geographic boundaries of Defendant Broken Arrow Public Schools' school district. She suffers from a learning disability and possibly other undiagnosed disorders, for which she has received an IEP from Defendant Broken Arrow Public Schools. She now attends Immanuel Christian Academy, a nonpublic religious school affiliated with Immanuel Lutheran Church.

29. Plaintiff Jerry Sneed and Plaintiff Shanna Sneed are the parents of Plaintiff B.S., a minor. For many years, they have actively sought help from Defendant Union Public Schools for B.S.'s special needs.

30. Plaintiff Jerry Sneed and Plaintiff Shanna Sneed have another child who is currently a student in the Union Public Schools school system.

31. Plaintiff B.S. spent all of last school year as a student in Defendant Union Public Schools' school district. He currently lives within the geographic boundaries of Defendant Union Public Schools' school district. He suffers from a learning disability, sensory integration disorder, a speech disorder, and possibly other diagnosed disorders, for which he has received an IEP from Defendant Union Public Schools. He now attends Town & Country, a nonpublic school.

32. Plaintiff Russell Spry and Plaintiff Stephanie Spry are the parents of Plaintiff G.S., a minor. For many years, they have actively sought help from Defendant Jenks Public Schools for G.S.'s special needs.

33. Plaintiff Russell Spry and Plaintiff Stephanie Spry have another child who is currently a student in the Jenks Public Schools school system.

34. Plaintiff G.S. spent all of last school year as a student in Defendant Jenks Public Schools' school district. He currently lives within the geographic boundaries of Defendant Jenks Public Schools' school district. He suffers from Asperger's syndrome, Attention-Deficit/Hyperactivity Disorder, and a mood disorder, for which he has received an IEP from Defendant Jenks Public Schools. He now attends Town & County, a nonpublic school.

35. Plaintiff Tim Tylicki and Plaintiff Kimberly Tylicki are the parents of Plaintiff M.T., a minor. For many years, they have actively sought help from Defendant Jenks Public Schools for M.T.'s special needs.

36. Plaintiff Tim Tylicki and Plaintiff Kimberly Tylicki are parents of two other children who are currently students in the Jenks Public Schools school system.

37. Plaintiff M.T. spent all of last school year as a student in Defendant Jenks Public Schools' school district. He currently lives within the geographic boundaries of Defendant Jenks Public Schools' school district. He suffers from autism, for which he has received an IEP from Defendant Jenks Public Schools. He now attends Town & Country, a nonpublic school.

38. Plaintiff Curtis Johnson and Plaintiff Jane Johnson are the parents of Plaintiff W.J., a minor. For many years, they have actively sought help from Defendant Tulsa Public Schools for W.J.'s special needs.

39. Plaintiff W.J. spent all of last school year and nearly all of the current school year that has elapsed as a student in Defendant Tulsa Public Schools' school district. He currently lives within the geographic boundaries of Defendant Tulsa Public Schools' school district. He suffers from a hearing impairment and partial deafness, a speech

8

disorder, a muscular disorder, and anxiety, for which he has received an IEP from Defendant Tulsa Public Schools.

40. Plaintiff Curtis Johnson and Plaintiff Jane Johnson intended to apply in October, 2010, for a scholarship to which they are entitled under the Act. They attended Defendant Tulsa Public Schools' school board meeting in October 2010, in which Tulsa Public Schools announced its intent not to accept any new scholarship applications under the Act.

41. Plaintiff Curtis Johnson and Plaintiff Jane Johnson refrained from applying for a scholarship due to fear of retaliation by Defendant Tulsa Public Schools.

42. Plaintiff Curtis Johnson, Plaintiff Jane Johnson, and Plaintiff W.J., would like for W.J. to attend a private Christian school that can properly address W.J.'s special needs and also provide him with a Christian and moral education.

43. Plaintiff Curtis Johnson, Plaintiff Jane Johnson submitted a scholarship application on or about March 11, 2011 and learned on or about March 26, 2011 that their scholarship application had been approved.

## B.        Defendants

44. Defendant Broken Arrow Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 3 of Tulsa County, Oklahoma.

45. Defendant Board of Education of Broken Arrow Public Schools controls Broken Arrow Public Schools' compliance with the terms of the Act.

46. Defendant Jarod Mendenhall is the Superintendent of Defendant Broken Arrow Public Schools. He is the chief officer of the District and is responsible for administering Board policies.

47. Defendant Jenks Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 5 of Tulsa County, Oklahoma.

48. Defendant Board of Education of Jenks Public Schools controls Jenks Public Schools' compliance with the terms of the Act.

49. Defendant Jane Hedrick is the Clerk of the Board of Education of Jenks Public Schools. She is responsible for recording district policies and facilitating compliance thereto.

50. Defendant Kirby Lehman is the Superintendent of Defendant Jenks Public Schools. He is the chief officer of the District and is responsible for administering Board policies.

51. Defendant Tulsa Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 1 of Tulsa County, Oklahoma.

52. Defendant Board of Education of Tulsa Public Schools controls Tulsa Public Schools' compliance with the terms of the Act.

53. Defendant Peggy Young is the Clerk of the Board of Education of Tulsa Public Schools. She is responsible for recording district policies and facilitating compliance thereto.

54. Defendant Keith Ballard is the Superintendent of Defendant Tulsa Public Schools. He is the chief officer of the District and is responsible for administering Board policies.

55. Defendant Union Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 9 of Tulsa County, Oklahoma.

56. Defendant Board of Education of Defendant Union Public Schools controls Union Public Schools' compliance with the terms of the Act.

57. Defendant Beverly Thummel is the Secretary to the Board of Education of Union Public Schools. She is responsible for recording district policies and facilitating compliance thereto.

58. Defendant Kirt Hartzler is the Associate Superintendent of Defendant Union Public Schools.

59. Defendant Cathy Burden is the Superintendent of Defendant Union Public Schools. She is the chief officer of the District and is responsible for administering Board policies.

## STATEMENT OF FACTS

### A.        The Act

60. The Lindsey Nicole Henry Scholarship for Students with Disabilities Program Act, OKLA. STAT. 70, § 13-101.1, *et seq.*, (commonly known as "H.B. 3393") (hereinafter "the Act"), gives certain students with disabilities the right to receive a scholarship from the State of Oklahoma to facilitate their attendance in a participating nonpublic school.

61. The Act entered into force on August 27, 2010.

62. The Act does not place discretion in the hands of the school districts. It gives parents who meet specified parameters the right to apply for a scholarship and mandates school districts to comply with its terms.

63. To be eligible, students must have spent the school year prior to their application in attendance at a public school, must have received an Individualized Education Program (IEP) for their disability, and (through their parents) must have timely gained acceptance in a participating nonpublic school.

64. The Act imposes upon nonpublic schools a series of detailed requirements and qualifications as a condition for eligibility. Specifically, to be eligible, a nonpublic school must (1) apply for eligibility, (2) specify the grade levels and services that it has available for students with special needs, (3) demonstrate that it meets certain accreditation requirements, (4) demonstrate fiscal stability, (5) demonstrate compliance with the antidiscrimination provisions of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, (6) demonstrate compliance with certain health and safety codes, (7) be academically accountable to the parent or guardian of participating children, (8) employ teachers with specified minimum credentials, (9) demonstrate compliance with state laws regulating nonpublic schools, and (10) demonstrate compliance with its published disciplinary procedures.

65. The Act also subjects nonpublic schools to a series of governmental controls and safeguards. Specifically, under the Act, the government has authority to (1) review the applications of nonpublic schools and reject them largely at its discretion, (2) review the fiscal soundness of an applicant nonpublic school, (3) ensure that nonpublic schools are in compliance with various safety laws and codes, (4) require that nonpublic schools

satisfy the accreditation requirements of the Oklahoma State Department of Education (OSDOE) or another accrediting association approved by the OSDOE, (5) review the qualifications of the teachers at a participating nonpublic school, (6) review a nonpublic school's compliance with its own disciplinary procedures relating to the expulsion of a student, and (7) require that participating parents agree to comply with their nonpublic school's parental involvement requirements.

66. The Act thus imposes significant costs on nonpublic schools in addition to the general costs of educating a child.

67. In order to reimburse these schools for those significant costs, the Act supplies Child Plaintiffs with a scholarship that they can use to offset a portion of the costs of their education, thus ensuring their ability to pay full tuition or an amount close to full tuition.

68. The Act requires participating students to maintain attendance throughout the school year unless excused for good cause and to comply with the school's code of conduct.

69. The Act similarly requires parents of participating students to timely request a scholarship and comply with their school's parental involvement requirements.

70. The Act also requires school districts to (1) annually report to the State the names of the students who participate in the scholarship program, (2) verify acceptance and enrollment in a participating nonpublic school on a quarterly basis, and (3) provide the scholarship funding as described in the next three paragraphs.

71. Scholarships issued pursuant to the Act are provided by the school district to the parent or guardian of eligible children. Parents must endorse their checks to their child's participating nonpublic school.

72. Accordingly, no money flows from the school district directly to the nonpublic school; all money first goes to the parents and is directed by them to the school of their true private choice.

73. The Act specifies that scholarships are to be equivalent to the sum of state funds allocable to the student-applicant. Namely, the scholarship is calculated by adding (1) "the local and county revenue for the school district which is chargeable in the State Aid formula," (2) "state-dedicated revenue," and (3) "state-appropriated funds per weighted average daily membership generated by that student for the applicable school year." However, the scholarship amount shall not be greater than the tuition and fees of the participating student's nonpublic school.

74. The Act further indicates that the weighted average daily membership is calculated using a grade multiplier (that is, a numerical factor assigned to each grade level) and a disability multiplier (that is, a numerical factor assigned to each disability).

75. The formula prescribed by the Act merely takes state funds allocable to the education of the eligible child and enables those funds to follow the child to an eligible nonpublic school.

76. The formula does not adjust Defendant School Districts' per-pupil state funding.

77. Under the Act, a school district may retain as much as 5% of the scholarship amount as an administrative fee.

78. Upon information and belief, the 5% administrative fee is greater than the actual costs of administering the program. Accordingly, the Act supplies school districts with additional funds.

79. The Act does not impose new liabilities on the State.

14

80. The Act expressly exempts school districts from having to shoulder additional costs, including for equipment and materials. It also exempts school districts from liability pursuant to their issuance of a scholarship under the Act.

81. The Oklahoma State Department of Education (OSDOE) subsequently issued regulations under the Act.

82. The regulations specify that school districts are to make payments in arrears on a quarterly basis.

83. The regulations also specify that within ten business days of receiving an application for a scholarship, a school district is obligated to request that the OSDOE calculate the student's maximum scholarship and notify the parents "of the maximum amount of the scholarship in writing in a timely manner, not to exceed thirty business days from the [original application]."

**B.        The Act's Legislative History**

84. Supporters of the Act introduced the bill (H.B. 3393) as a measure specifically designed to assist students with special needs.

85. Some of the Representatives who opposed the bill spoke about potential state constitutional infirmities. For example, Representative Jordan from the Jenks district noted that a similar scholarship program was previously stuck down by the Arizona Supreme Court on state constitutional grounds. He noted that "[a]fter a long and expensive legal battle, they declared that the scholarship program . . . violated the state's constitution Blaine Amendment, which is the exact same thing we have in Oklahoma under Art. II, § 5" and then commented that the Arizona decision "ought to cause some concern" for Oklahoma lawmakers.

15

86. Representative Jordan also noted that Defendant Jenks Public Schools has 1954 students on an IEP, indicating that this bill threatens to take a lot of money out of Defendant Jenks' budget.

87. Members in the House argued over whether the Act would result in a net savings to the school districts or a net loss.

88. Many Members argued that because the school districts (by their own admission) actually pay more than they receive for special needs children, the bill actually saves the districts money.

89. Additionally, the Act will result in smaller class sizes and reduced administrative expenses for the school districts.

90. And the Act will remove some students with special needs from the classroom. The students, by virtue of various behavioral and other disorders, might serve as a distraction in the classroom. Their absence may improve the educational opportunities of the other students remaining in the classroom.

91. Speaker *pro tempore* Steele, a former public school teacher, said: "I am a proponent of public education. I think most of you know my dad is currently a superintendant at Jones schools. . . . I am a proponent of public education but I am not for protecting the status quo." He later added: "School districts tell me that they lose money with special needs children because they don't receive enough in state aid to actually meet the needs that are adequate for these students. I believe that by capping the amount of this scholarship, we can actually help school districts save money."

92. Representative Nelson noted that the legal staff in the OSDOE reviewed and approved of the bill, as did Governor Henry's office. Nelson further noted that Governor Henry is a committed supporter of public education and nevertheless supported the Act.

93. Senators debating the measure were similarly divided on whether H.B. 3393 would be good or bad for public education.

94. The Senate sponsor, Senator Anderson, noted that he is "a product of public education" who sends his children to public schools. He said that the measure had been reviewed by Sandy Garrett, then-State Superintendant of Public Instruction, a Democrat, and that the version of the bill that ultimately passed incorporated her comments.

95. On May 21, 2010, the Oklahoma House approved H.B. 3393 by a vote of 54 to 46. The Senate approved it on May 26 by a vote of 25 to 22.

**C.        Defendant School Districts' Policy of Noncompliance**

96. The Act was signed into law on May 28, 2010.

97. Each of the Parent Plaintiffs applied for scholarships under the Act.

98. Each of the Child Plaintiffs had applications for scholarships made in his or her name.

99. Some of the Parent Plaintiffs applied for scholarships as early as June.

100.     For many months following, Defendants did nothing to suggest that they would not comply with the Act. Indeed, nearly all of the Parent Plaintiffs believed at the time they applied for a scholarship that they would receive one.

101.     Plaintiff Aldo Eagle and Plaintiff Michele Eagle found out for the first time that they would not be receiving a scholarship from Defendant Jenks Public Schools while watching the news in October.

102. Plaintiffs Stefan Hipskind and Stephanie Hipskind had email correspondence with Defendant Union Public Schools as late as August 18, 2010. That correspondence clearly indicated an intent to comply with the Act ("Once all procedures are established, we will be in touch with you *and abide by those procedures*." (emphasis added)).

103. Plaintiff Amy Howard received email correspondence with Defendant Broken Arrow Public Schools as late as September 30, 2010, which suggested that Defendant Broken Arrow Public Schools still intended to comply with the Act.

104. On or about the last week of October 2010, Defendant Jenks Public Schools sent a mailing to all of its scholarship applicants stating that it believes that the Act is unconstitutional and expressing its policy of noncompliance.

105. Jenks enclosed a "Position Statement" in the mailing.

106. The Jenks Position Statement is materially identical to a letter written by Attorney Doug Mann to the Oklahoma Bar Association in response to a grievance filed against him.

107. In that letter, Mann indicates that he advised seven Tulsa County school districts on the constitutionality of the Act.

108. Upon information and belief, those seven school districts, including Defendant School Districts, did not seek a second opinion from outside attorneys with expertise in constitutional law before announcing their intentions not to comply with the Act.

109. Upon information or belief, the seven school districts, including Defendant School Districts, decided not to comply with the Act by relying exclusively or primarily on the advice of Mann.

110. Among the seven school districts named in Mann's letter are Defendants Broken Arrow, Jenks, Tulsa, and Union Public Schools.

111. In his letter, Mann argues that the Act (1) violates one of Oklahoma's Blaine Amendments (OKLA. CONST. art. II, § 5); (2) the Act interferes with the state's obligation to establish and maintain a free public school system as mandated by Oklahoma's other Blaine Amendment (OKLA. CONST. art. I, § 5) and OKLA. CONST. art. XIII, § 1; (3) the Act mandates school districts to give their parents a "gift" in violation of OKLA. CONST. art. X, § 15; and (4) the Act distinguishes between different classes of students that he deems "identically situated."

112. Upon information and belief, Mann's argument regarding "identically situated" students is a reference to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

113. Defendant Broken Arrow Public Schools issued a press release on January 24, 2011, repeating many of Mann's arguments.

114. The January 24 press release also cites several policy justifications for noncompliance.

115. The January 24 release states, as a justification for noncompliance, that "private schools are able to be selective in their enrollment process."

116. The January 24 press release states, as a justification for noncompliance, that "the eight scholarship requests currently on record with the Broken Arrow school district will cost $40,000."

117. In the 2008-09 school year, Defendant Broken Arrow Public Schools had a student enrollment of approximately 16,200.

19

118. The January 24 press release states that Defendant Broken Arrow Public Schools is prepared to spend "$1.56 per student over the course of" their legal battles against the Act.

119. $1.56 spent on each of 16,200 students would result in a total amount of $25,272.

120. Upon information and belief, Defendant Broken Arrow Public Schools will spend much more than $25,272 in attorney's fees, expenses, employee time, and official time litigating against and otherwise objecting to the Act.

121. Upon information and belief, Defendant Broken Arrow Public Schools has already spent more than $25,272 in attorney's fees, expenses, employee time, and official time litigating against and otherwise objecting to the Act.

122. In a January 24, 2011 public statement, Defendant Mendenhall, Superintendent of Broken Arrow Public Schools, offered a legal opinion about the Act's constitutionality on behalf of Broken Arrow Public Schools.

123. In his January 24 public statement, Defendant Mendenhall stated that "[the Act] is in direct violation of the Oklahoma State Constitution."

124. Defendant Mendenhall also stated that "[the Act] strikes a blow to both the Oklahoma Constitution and to public school districts across the state."

125. In a January 24, 2011 public statement, Defendant Lehman, Superintendent of Jenks Public Schools, offered a legal opinion about the Act's constitutionality on behalf of Jenks Public Schools.

126. In his January 24 public statement, Defendant Lehman stated that "[the Act] is unconstitutional."

127. In his January 24 public statement, Defendant Lehman also declared that the Act's "primary flaw is that the payment of taxpayer funds . . . to private sectarian school [sic] violates Article II, section 5 of the Oklahoma Constitution [sic] which precludes the use of public taxpayer funds, directly or indirectly, for the use, benefit, or support of sectarian institutions."

128. In his January 24 public statement, Defendant Lehman also stated that noncompliance with duly enacted but unconstitutional law is unactionable. Defendant Lehman cited a 1940 Oklahoma state court decision as the basis for his legal opinion.

129. The 1940 decision cited by Defendant Lehman indicates that disobedience against a law that has been judicially declared unconstitutional cannot be punished.

130. The 1940 decision does not sanction any decision by government official "vigilantes" who dislike a particular law to declare it "unconstitutional" and act as they choose.

131. In a January 24, 2011 public statement, Defendant Burden, Superintendent of Union Public Schools, offered a legal opinion about the Act's constitutionality.

132. In her January 24 public statement, Defendant Burden declared conclusively that "[t]he constitutions of this nation and this state demand a clear separation between church and state and numerous articles in the Oklahoma State Constitution make it abundantly clear that tax dollars cannot be diverted to fund private school systems or those associated with a religious institution."

133. In her January 24 public statement, Defendant Burden also stated that the Act is "about selfish motives that benefit only one child." Defendant Burden also claimed that

21

the Act will "siphon off financial resource[s], parent support, and specific student talent[]" from public school systems.

134. Defendant Board of Education of Jenks Public Schools resolved not to comply with the Act on October 4, 2010.

135. Upon information and belief, the primary purpose of Defendant Jenks Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

136. Defendant Lehman's annual salary could fund the scholarship for all of his district's applicants under the Act for more than two years.

137. When enacting its policy, Defendant Jenks Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

138. When enacting its policy, Defendant Jenks Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in their school system.

139. Defendant Jenks Public Schools did not attempt to evaluate what would be in the best interests of Plaintiffs J.E., G.S., and M.T. in deciding to not to comply with the Act.

140. Defendant Jenks Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

141. Defendant Board of Education of Broken Arrow Public Schools resolved not to comply with the Act on October 4, 2010.

142. Upon information and belief, the primary purpose of Defendant Broken Arrow Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

143. Defendant Mendenhall's annual salary could fund the scholarship for all of his district's applicants under the Act for more than two years.

144. When enacting its policy, Defendant Broken Arrow Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

145. When enacting its policy, Defendant Broken Arrow Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in their school system.

146. Defendant Broken Arrow Public Schools did not attempt to evaluate what would be in the best interests of Plaintiffs G.B., B.L.R., T.K., and A.S. in deciding to not to comply with the Act.

147. Defendant Broken Arrow Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

148. Defendant Board of Education Union Public Schools resolved not to comply with the Act on October 11, 2010.

149. Upon information and belief, the primary purpose of Defendant Union Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

150. Defendant Burden's annual salary could fund the scholarship for all of her district's applicants under the Act for more than two years.

151.  When enacting its policy, Defendant Union Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

152.  When enacting its policy, Defendant Union Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in their school system.

153.  Defendant Union Public Schools did not attempt to evaluate what would be in the best interests of Plaintiffs L.H., A.J.H., and B.S. in deciding to not to comply with the Act.

154.  Defendant Union Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

155.  The Board of Education of Bixby Public Schools resolved not to comply with the Act on October 11, 2010.

156.  On October 12, Owasso Public Schools became the fifth Tulsa-area school district to adopt a policy of noncompliance with the Act.

157.  Upon information and belief, Liberty Public Schools also adopted a policy of noncompliance.

158.  Defendant Board of Education Tulsa Public Schools resolved not to comply with the Act on October 18, 2010 with respect to those applications not yet received.

159.  Upon information and belief, the primary purpose of Defendant Tulsa Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

160.  Defendant Ballard's annual salary could fund the scholarship for all of his district's applicants under the Act for more than two years.

24

161. When enacting its policy, Defendant Tulsa Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

162. When enacting its policy, Defendant Tulsa Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in their school system.

163. Defendant Tulsa Public Schools did not attempt to evaluate what would be in the best interests of Plaintiff W.J. in deciding to not to comply with the Act.

164. Defendant Tulsa Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

165. Upon information and belief, attorney Doug Mann is counsel to each of the Defendant School Districts, as well as to Bixby Public Schools, Liberty Public Schools, and Owasso Public schools.

166. Mann's direct involvement in this matter has been reported by Oklahoma media outlets.

167. Mann's actions have harmed the public image of attorneys in the State of Oklahoma.

168. Upon information and belief, the grievance filed against Mann referred to in paragraph 106 was filed in response to the harm that Mann, through his professional actions, is inflicting upon the legal profession in Oklahoma.

**D.        Defendant Tulsa Public Schools' Purported Compliance**

169. Defendant Tulsa Public Schools did not faithfully honor the scholarship application that it received, prior to October 18, from Plaintiff Laura Riddick.

170. The OSDOE regulations provide that "payments will be made in arrears, following the completion of each quarter." The Regulations further provide that parents are to receive a calculation of their "maximum scholarship amount," in writing no less than thirty days following the date of their application.

171. Plaintiff Laura Riddick never received a written calculation from Defendant Tulsa Public Schools.

172. The school year for Tulsa Public Schools began on August 23, 2010.

173. The Act provides that "[p]ayment shall be made by the school district."

174. Plaintiff Laura Riddick received her first check from Defendant Tulsa Public Schools (for $1,034.81) on January 4, 2011, over four months after the start of the school year.

175. She received no written communication from Defendant Tulsa Public Schools articulating her calculated "maximum scholarship" amount or expressing how Defendant Tulsa Public Schools or OSDOE arrived at that calculation.

176. Upon information and belief, the calculation is inaccurate for it fails to take into account all of Plaintiff K.R.'s severe dyslexia.

177. Upon information and belief, Defendant Tulsa Public Schools changed Plaintiff K.R.'s (Ms. Riddick's daughter) information in OSDOE's system, changed their internal records, or omitted in their report to OSDOE some of the details of K.R.'s condition, resulting in an altered calculation by OSDOE.

178. Upon information and belief, Defendant Tulsa Public Schools reduced or caused the reduction of Plaintiff K.R.'s scholarship to retaliate against Plaintiff Laura Riddick for claiming a scholarship pursuant to the Act.

179. Defendant Tulsa Public Schools claims publicly to be honoring the scholarship applications that it received prior to October 18.

180. Instead, Defendant Tulsa Public Schools is holding itself out to be in compliance with the Act while tacitly keeping scholarship funds owed to the Riddick family and their other scholarship applicants.

**E.        Oklahoma's Blaine Amendments**

181. As noted, Oklahoma's Blaine Amendments, OKLA. CONST. art. I § 5, and art. II, § 5, have been publicly relied on by Defendant School Districts as justifications for their policies of noncompliance.

182. The Blaine Amendments prohibit the use of state property in the support of "sectarian" institutions and certain other "sectarian" purposes.

183. When they were enacted, the word "sectarian," and the general thrust of the 'Blaine' provisions, was understood as an impediment on a particular religious minority: Roman Catholics.

184. The use of the word "sectarian" to mean "Catholic" was documented in Oklahoma at around the time of the state's founding. *See*, *e.g.*, *Indian Schools*, Indian Advocate 62, 63 (Feb. 1904).

185. The Blaine Amendments were part of a broad trend, which long pre-dated Oklahoma's statehood, to use law to marginalize the growing Catholic community in the United States.

186. These provisions came to be known by the name "Blaine Amendments" because of their relationship to the 1875 Speaker of the United States House of Representatives, James G. Blaine.

187.  Speaker Blaine proposed an amendment to the Federal Constitution that would have imposed a bar to funding to certain "sectarian" organizations.

188.  The debates of the floor on the United States Senate, in which Senators were discussing the merits of Blaine's proposed amendment, repeatedly referred to the Roman Catholic Church.

189.  Senators who supported the amendment used rhetoric such as the following:

> [T]here is a large and growing class of people in this country who are utterly opposed to our present system of common schools . . . . The liberty of conscience, while it is universal in every church but one, is not a liberty of conscience to stand in the way of [the development of public highways and common schools] . . . . The supposed infallibility of the Holy Father would be a sufficient refutation of the suggestion [that the Catholic Church advances religious liberty], for it is the greatest maxim of the executive affairs in that hierarchy, *semper eadem*–it never changes . . . . [T]hese dogmas [of intolerance] . . . are at this moment the earnest, effective, active dogmas of the most powerful religious sect that the world has ever known, or probably ever will know–a church that is universal, ubiquitous, aggressive, restless, and untiring.

4 CONG. REC. 5585, 87, 88 (1876).

190.  Although the Federal Blaine Amendment did not become law, it was followed by similar proposals in many states. Blaine's supporters turned to the state legislatures to enact similar provisions in their state constitutions. Their ideological predecessors (dating back to the 1840s) and heirs (dating up to the early twentieth century) managed to get forty-one states to adopt a state version of the Blaine Amendment.

191.  Virtually all of the Blaine Amendments, including Oklahoma's, were enacted during a period in the late eighteenth century and early nineteenth century of severe nativism, xenophobia, and religious strife in which much legal action was motivated by hostility towards Catholics.

192. The Supreme Court in *Mitchell* v. *Helms*, 530 U.S. 793, 828-29 (2000), condemned the ideological doctrines embodied by the Blaine Amendments in strong terms, stating that they have a "shameful pedigree," were "born of bigotry," and "should be buried now."

193. Anti-Catholicism in Oklahoma's early history is manifested not just in its Blaine Amendments but in other legal arenas as well.

194. For example, Oklahoma's prohibition of alcohol during the early twentieth century was motivated primarily by anti-Catholicism.

195. As one scholar recently explained, prohibition "was part of a pattern of anti-Catholic sentiment that flourished in early twentieth-century Oklahoma. Groups, such as the Guardians of Liberty and the Knights of Luther, formed to foil alleged Catholic plots to overthrow the federal and state governments." James Edward Klein, GRAPPLING WITH DEMON RUM: THE CULTURAL STRUGGLE OVER LIQUOR IN EARLY OKLAHOMA 87 (2008).

196. Early public schools in the United States were dominated by nondenominational Protestant theology and values.

197. Horace Mann, referred to by many as the "father of public education," advocated for public schools that advanced a "vague and inclusive Protestantism" and required daily Bible reading.

198. The Bible commonly used in the public schools of the early twentieth century was not any Bible of a students' (or his parents') choosing, but the King James Bible. Jewish and Catholic public school students, who largely objected to the use of the King James Bible, were often nevertheless required to join their class as they read from a Protestant version of the Bible.

199. Oklahoma's early public schools were no less religious than those of the rest of the country.

200. Oklahoma's early public schools used the McGuffey Readers.

201. The McGuffey Readers seek to indoctrinate students with Protestant morality and religious thought.

202. Religious Protestants maintained a strong influence over the school system throughout Oklahoma's early decades.

203. That heavy Protestant influence in Oklahoma's early public schools was influential in the 1923 decision to ban the teaching of evolution in Oklahoma's public schools.

204. The banner of anti-Catholicism in Oklahoma's public schools was carried prominently by the Ku Klux Klan in the 1920s.

205. One of Oklahoma's Blaine Amendments was mandated by Congress. The Enabling Act of the State of Oklahoma of 1906, Pub. L. No. 59-234, ch. 3335, § 510, 34 STAT. 267, 270-71 (1906), required, as a condition on statehood, Oklahoma to adopt in its original constitution a provision requiring "the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control . . . ."

206. The Enabling Act Congress had the same nefarious anti-Catholic motives as the Congress that attempted to pass the Federal Blaine Amendment.

207. The Enabling Act Congress sought to defund Catholic education.

208. Congress had a history of disenfranchising Catholics in the Indian and Oklahoma Territories (which would later become the State of Oklahoma).

30

209. Congress originally funded missionary churches in Indian Territory in its patronizing attempts to Christianize Native American communities. W. DAVID BAIRD AND DANNEY GOBLE, OKLAHOMA: A HISTORY 138 (2008). However, once it became evident in 1896 that most of those government funds were going to Catholic mission schools, Congress revoked funding of "sectarian" schools. *No Sectarian Support*, N.Y. TIMES, Feb. 25, 1896.

210. The word "sectarian" in the Enabling Act provision was, as the Supreme Court has said, widely recognized as "code for 'Catholic.'" *Mitchell* v. *Helms*, 530 U.S. 793 (2000).

211. The word "sectarian" in the Enabling Act provision was recognized by the Indian and Oklahoma Territories as code for Catholic.

212. Oklahoma's Blaine Amendments were not bans on religious control of schools or the teaching of religious doctrine. They were instead attempts to marginalize Catholics and make the practice of Catholicism as difficult as possible.

213. OKLA. CONST. art. I, § 5 is the codification of the language in the Enabling Act and reflects the intent of the Enabling Act.

214. OKLA. CONST. art. II, § was enacted with the purpose of anti-Catholicism by prohibiting, on the basis of "sectarian" identity, certain types of direct and indirect aid.

**F.      Harms Inflicted by Defendant School Districts**

215. Many of the Plaintiffs cannot afford to keep their children in nonpublic school, but have resolved that they will find a way to do so anyway, even at great cost and personal sacrifice.

216.  Because of Defendants' refusal to carry out the provisions of the Act, and Plaintiffs' financial hardship, some of the nonpublic schools attended by Child Plaintiffs allowed Child Plaintiffs to attend for free or at significantly reduced cost.

217.  Child Plaintiffs J.E., L.H., B.L.R., A.S., B.S., and M.T., struggled academically and performed below their ability as a result of the educational services they received in public school.

218.  Child Plaintiffs A.J.H., T.K., and K.R. regressed academically as a result of the educational services they received in public school.

219.  Without the benefits of the Act, many of the Parent Plaintiffs would have to send their children back to their former public schools.

220.  Re-enrollment in public school would be highly detrimental to the Child Plaintiffs.

221.  Parent Plaintiffs fear for their children, should they have to re-enroll in public school.

222.  Upon information and belief, Defendants have not undertaken any evaluation of whether re-enrollment in public schools would be in the best interests of the Child Plaintiffs.

223.  Defendants' public schools are, in some cases, unsafe for the Child Plaintiffs.

224.  Defendants' public schools do not, in some cases, have adequate resources to meet the needs of the Child Plaintiffs.

225.  Defendants' public schools are not, in some cases, properly staffed to meet the needs of the Child Plaintiffs.

226. The staff at Defendants' public schools are, in some cases, not properly trained to meet the needs of the Child Plaintiffs.

227. The staff at Defendants' public schools are, in some cases, not sufficiently patient to meet the needs of the Child Plaintiffs.

228. Defendants' schools are unwilling to properly accommodate Child Plaintiffs.

229. Defendants' schools are unwilling to meet the needs of Child Plaintiffs.

230. Plaintiff B.L.R., child of Plaintiffs Mike and Amy Howard, was beaten with nunchucks by another student while in his public school during school hours.

231. Plaintiff B.L.R., was shoved by a substitute teacher, an agent of Defendant Broken Arrow Public Schools, while in his public school during school hours.

232. Plaintiff B.L.R., has his head shoved in a toilet while in his public school during school hours.

233. Plaintiff B.L.R. was left outside by himself for an extended period of time during the school day and by an agent of his public school as a means of punishing him for behavior caused by his disabilities.

234. Plaintiff B.L.R. cried daily and stated that he wanted to kill himself due to the manner of his suffering at his public school, which is maintained by Defendant Broken Arrow Public Schools.

235. Defendant Broken Arrow made no attempt to inform Plaintiffs Mike and Amy Howard of the suffering that B.L.R. went through while under their care.

236. If he is denied the benefits of the Act, Plaintiffs Jerry and Shanna Sneed will probably have to re-enroll their son in public school.

237. Plaintiff B.S., the child of Plaintiffs Jerry and Shanna Sneed suffered severe emotional, mental, and physical abuse while a child in public school.

238. If re-enrolled in public school, Plaintiff B.S. would suffer continued severe emotional, mental, and physical abuse.

239. Plaintiff G.S., the child of Plaintiffs Russell and Stephanine Spry, was severely bullied because of his special needs while a student in public school.

240. Plaintiff G.S. has not been bullied in his nonpublic school.

241. If re-enrolled in public school, Plaintiff G.S. would suffer from repeated severe bullying.

242. Plaintiff G.S. suffered academically while in public school.

243. The special education coordinator for Defendant Jenks Public Schools recommended to Plaintiffs Russell and Stephanie Spry that Plaintiff G.S. be enrolled in nonpublic school.

244. Plaintiff Marjorie Boyd-Lyons has experienced great emotional distress based on the uncertainty about whether she would be able to obtain a scholarship for her child.

245. Plaintiff Nancy Kimery, after learning of the Act, and in good faith expectation that Defendant Broken Arrow Public Schools would comply with it, made a promise to her son that he would be able to remain in nonpublic school as long as he needs to be there.

246. Plaintiff Nancy Kimery believes that her son, Plaintiff T.K., loves his new school and is, for the first time in a long time, a happy child.

247. Plaintiff T.K. cried every day due to his suffering in his public school, which is maintained by Defendant Broken Arrow Public Schools.

34

248. Kimery is grateful in particular that her son no longer must eat lunch in the public school lunch room that she has described as "Hell."

249. Plaintiff A.S., the child of Plaintiffs Joe and Beth Serafin, received her special education instruction in a group of ten other special education students with vastly different disabilities. The instruction that she received was not geared to her specific needs.

250. Plaintiff A.S., was severely bullied while a student in public school.

251. If re-enrolled in public school, Plaintiff A.S. would suffer from repeated severe bullying.

252. Plaintiff K.R., the child of Plaintiff Laura Riddick, is severely dyslexic and has great difficulty reading.

253. Defendant Tulsa Public Schools either did not have or did not use special education materials designed for dyslexia when trying to educate Plaintiff K.R.

254. Defendant Tulsa Public Schools has no program for dyslexics.

255. Plaintiff K.R. was promoted several grade levels with A and B grades, despite the facts that Defendant Tulsa Public Schools had not taught her to read and that she needed assistance to find her way to the bathroom.

256. Plaintiff K.R. regressed two grade levels while in public school.

257. If re-enrolled in public school, Plaintiff K.R. would be devastated and would regress further.

258. Plaintiff Laura Riddick has another child who plans to attend college next year.

259. Riddick does not have the financial ability to send Plaintiff K.R. to nonpublic school while also sending her other child to college.

260.  As a result of Defendant Tulsa Public School's actions in violation of the Act, Riddick may have to decide which of her children she will support.

261.  On October 31, 2008, Plaintiffs Tim and Kimberly Tylicki received a call from Defendant Jenks Public Schools asking them to come to their son's (Plaintiff M.T.) school. This was a fairly common occurrence because of Defendant Jenks Public Schools' inability to manage Plaintiff M.T.'s condition and so frequently asked Plaintiffs Tim and Kimberly Tylicki to take their son home.

262.  After receiving that phone call on October 31, 2008, Plaintiff Tim Tylicki went to his son's school expecting to be asked to take Plaintiff M.T. home. To his surprise, he was asked to attend, without notice or prior warning, a meeting to review M.T.'s IEP.

263.  Typically, IEP review meetings are noticed in writing long before they are held.

264.  Typically, parents invited to attend an IEP meeting are informed of the subject matter likely to be discussed during the meeting.

265.  Plaintiff Tim Tylicki did not have the benefit of prior notice or the ability to review his notes and collect his thoughts on the subject matters discussed at his son's IEP review meeting.

266.  At that meeting, agents of Jenks Public Schools informed Tylicki that from that day forward they would only be educating Plaintiff M.T. for a half-day (literally halving Plaintiff M.T.'s educational opportunities) and then threatened Tylicki by saying that if Plaintiff M.T. was unable to remain in his class at least 75% of his new reduced schedule, he would be dismissed from school and that the Tylickis would be forced to homeschool.

267. Defendant Jenks Public Schools further informed Tylicki that in the event that they forced the Tylickis to homeschool their child, Defendant Jenks Public Schools would provide the Tylickis with a tutor for just three hours per week.

268. Upon information and belief, Defendant Jenks believed that it could do just as good of a job educating M.T. in three hours at home using a private tutor as it was doing during a whole week in school.

269. Plaintiff Tim Tylicki rejected Defendant Jenks Public School's ultimatum. Plaintiff M.T. remained in his public school until leaving to take advantage of the benefits provided to him by the Act.

270. Some of the Parent Plaintiffs may be able to afford to keep their children in a nonpublic school to provide them with the special assistance that they believe their children need. But many will have to make significant lifestyle changes in order to do so.

271. For example, the Plaintiffs Russell and Stephanie Spry might have to sell their vehicle or vehicles and purchase cheaper ones.

272. Plaintiffs Tim and Kimberly Tylicki might have to borrow against a life insurance policy.

273. Plaintiffs Joe and Beth Serafin might have to increase their hours at work and will likely have to require their older daughter to work her way through college (Plaintiff Beth Serafin has already switched from part-time to full-time in order to meet tuition payments to date).

274. If Child Plaintiffs re-enrolled in public school, they would suffer from retaliation by their school districts.

275. Plaintiff Nancy Kimery has already been retaliated against by Defendant Broken Arrow Public Schools.

276. Plaintiff Nancy Kimery is a former educator and was offered a part time job by Defendant Broken Arrow at around the same time that she sought a scholarship under the Act for the benefit of her son.

277. Kimery was more than qualified for the job but wanted the work and knew many of the people she would be working with from her prior employment as a teacher.

278. Kimery was told to report to her assigned school one Wednesday morning to fill out the necessary paperwork and commence her employment.

279. Upon information and belief, Defendant Broken Arrow Public Schools learned of Plaintiff Kimery's intent to apply for a scholarship under the Act prior to the commencement of her employment.

280. Within a week of the day that Plaintiff Kimery was instructed to report to her assigned school, Defendant Broken Arrow Public Schools contacted Kimery to inform her that the job for which she had been hired no longer exists.

281. Plaintiff W.J., the minor child of Plaintiffs, Curtis and Jane Johnson, has been beaten by other children while in his former public school, a school controlled by Defendant Tulsa Public Schools.

282. Employees or agents of Defendant Tulsa Public Schools were present during at least one episode of physical violence against Plaintiff W.J.

283. Employees or agents of Defendant Tulsa Public Schools have discouraged Plaintiff W.J. from reporting episodes of violence against him.

284. Employees or agents of Defendant Tulsa Public Schools have punished Plaintiff W.J. as a result of his efforts to report episodes of violence against him.

285. Upon information and belief, employees or agents of Defendant Tulsa Public Schools have never punished (whether via detention, suspension, expulsion, or any other means) the student or students for harming Plaintiff W.J. during school hours and on school grounds.

286. Plaintiff Jane Johnson was previously a successful engineer and is now a stay at home mom.

287. Plaintiff Jane Johnson was compelled to leave her job as an engineer in order to tutor her son after school, due to Defendant Tulsa Public School's failure to protect Plaintiff W.J. from harm while at school, and as a result of Tulsa Public Schools' hostile posture in dealing with Plaintiffs Curtis and Jane Johnson.

288. For approximately than three years, Plaintiff Jane Johnson sat in her son's school playground while he was at recess to ensure her son's safety.

289. Employees or agents of Defendant Tulsa Public Schools have demanded that Plaintiff W.J. be medicated in a manner inconsistent with the directions of W.J.'s physician.

290. Upon information and belief, some of those employees or agents who recommended a particular medical treatment were aware that W.J.'s physician made a contrary recommendation.

291. Upon information and belief, some of those employees or agents who recommended a particular medical treatment did not retract (or affirmatively repeated)

their recommendation upon learning that W.J.'s physician made a contrary recommendation.

292. Upon information and belief, those employees or agents who recommended a particular medical treatment were not themselves physicians.

293. Upon information and belief, those employees or agents who recommended a particular medical treatment did not have sufficient medical training to qualify them to opine as they did.

294. Upon information and belief, those employees or agents who recommended a particular medical treatment did so without regard for the best interests of W.J.

295. On at least one occasion, W.J. was beaten by other students while one of his teachers watched.

296. When one of W.J.'s parents came to the school to speak with the principal about this episode of violence, the principal quickly left the school campus without speaking with them.

297. Upon information and belief, W.J.'s principal left the school in an effort to avoid speaking to Plaintiffs Curtis and Jane Johnson.

298. After another episode of severe violence against W.J. by a fellow student on school grounds and during school hours, W.J. reported the incident to his principal requesting permission to call his father.

299. In response, not only did the principal fail to allow W.J. to use the telephone, the principal demanded that W.J. describe the incident in his own pen in a letter to the principal.

300. The principal read W.J.'s written description, stated the principal's disapproval of the description, and demanded that W.J. write it again. When W.J. repeated the same story, his principal sent him out of the office.

301. Plaintiffs Curtis and Jane Johnson have been repeatedly discouraged by agents or employees of Defendant Tulsa Public Schools from taking advantage of the Act and enrolling their child in private school.

302. Upon learning that Curtis and Jane Johnson are considering sending W.J. to a nonpublic school pursuant to the Act, Defendant Tulsa Public Schools made two offers to the Johnson family designed to entice them not to apply for benefits under the Act.

303. Those offers both involved considerable expense to Defendant Tulsa Public Schools over a period of many years.

304. Upon information and belief, those offers entailed violations of the District's own rules.

305. Defendant Tulsa Public Schools has attempted to impede Plaintiffs Curtis and Jane Johnson's efforts to take advantage of the Act.

306. For example, Defendant Tulsa Public Schools has made it difficult for Plaintiffs Curtis and Jane Johnson to obtain teacher recommendations, which are necessary for Plaintiff W.J.'s enrollment in a nonpublic school.

307. Similarly, upon information and belief, Tulsa Public Schools has taken efforts to alter or otherwise affect Plaintiff W.J.'s academic record.

308. Defendant Tulsa Public Schools has no ability to effectively and safely care for Plaintiff W.J.

309. Defendant Tulsa Public Schools has no ability to protect the Johnson family from the retaliation of the district's employees and agents.

310. Defendants' actions have forced Plaintiffs to disclose or make public previously private information about Child Plaintiffs' special needs that were previously confidential.

311. By forcing Child Plaintiffs to make their special needs public, Defendants display a lack of concern for the best interests of the Child Plaintiffs.

312. Defendant Tulsa Public Schools is not compliant with the requirements of No Child Left Behind, a series of federal laws and regulations.

313. Defendant Tulsa Public Schools has demonstrated deficiency in its reading program.

314. Defendant Tulsa Public Schools' mathematics 2008-09 proficiency rate for special education students was 48.68%. The state target was 60.93%.

315. Defendant Tulsa Public Schools' reading 2008-09 proficiency rate for special education students was 46.15%. The state target was 62.13%.

316. In the school year 2008-09, only 47.62% of children in Defendant Tulsa Public Schools' program for preschool special education were performing academically on target with their peers when they turned age six or left the program. The state average was 55.0%.

317. In the school year 2008-09, only 50.00% of children in Defendant Tulsa Public Schools' program for preschool special education were functioning within age expectations regarding their social-emotional skills when they turned age six or left the program. The state average was 54.50%.

318. In the school year 2008-09, only 57.14% of children in Defendant Tulsa Public Schools' program for preschool special education were functioning within age expectations regarding their behavioral skills when they turned age six or left the program. The state average was 67.70%.

319. Defendant Union Public Schools' mathematics 2008-09 proficiency rate for special education students was 59.95%. The state target was 60.93%.

320. Defendant Union Public Schools' reading 2008-09 proficiency rate for special education students was 57.02%. The state target was 62.13%.

321. The OSDOE graded Defendant Broken Arrow Public Schools' special education program as "Needs Assistance" for school years 2005-06 and 2006-07.

322. The OSDOE graded Defendant Tulsa Public Schools' special education program as "Needs Assistance" for school years 2007-08.

323. The OSDOE graded Defendant Union Public Schools' special education program as "Needs Assistance" for school years 2005-06.

## G.     The Benefits of Nonpublic Schools for Child Plaintiffs

324. Understanding the value of HB 3393, Governor Brad Henry, a Democrat and known supporter of public education, signed it the day following its passage by the legislature.

325. Transferring to nonpublic school has been tremendously beneficial for all of the Child Plaintiffs.

326. Parent Plaintiffs are all very pleased by the results they have seen from their nonpublic schools.

43

327. Child Plaintiffs have progressed considerably in the few months that they have been enrolled in nonpublic school.

328. Child Plaintiffs are progressing at a greater rate while in nonpublic school than they did while in public school.

329. Child Plaintiffs are generally happy in nonpublic school.

330. Child Plaintiffs were generally unhappy in public school.

331. If Child Plaintiffs continue to progress as a result of their nonpublic education, they are more likely to become more productive citizens of the State of Oklahoma as a result of their enrollment in their nonpublic schools.

332. The enrollment of Child Plaintiffs in nonpublic school is a significant benefit to themselves, their families, their communities, and to the entire State of Oklahoma.

333. For example, Plaintiffs L.H. and A.J.H., the minor children of Plaintiffs Stefan and Stephanie Hipskind, improved academically shortly after enrolling in nonpublic school.

334. Plaintiff J.E., child of Plaintiffs Aldo and Michelle Eagle, practically skips to his new nonpublic school each day.

335. For Plaintiff G.B.L, child of Plaintiff Marjorie Boyd-Lyons, public school was a miserable experience.

336. Plaintiff G.B.L. is happy and performing well in her new nonpublic school.

337. Plaintiffs Mike and Amy Howard are frightened by the prospect of re-enrolling their child in public school because their son, while a public school student, was bullied severely.

338.  The interests of Child Plaintiffs are better served in their nonpublic schools than in Defendants' public schools.

**H.     Defendant School Districts' Temporary Policy Change**

339.  Defendant School Districts have all announced that they are temporarily suspending their Policies of non-compliance.

340.  On January 18, 2011, Attorney General Scott Pruitt wrote a letter to the Superintendents of Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools, and to Liberty Public Schools. The letter warned some Defendant Board Members that they risked significant legal liability for their "willful neglect or disobedience" of their duties under the Act.

341.  On January 18, 2011, Defendant Tulsa Public Schools voted to rescind its Policy of noncompliance as it related to the scholarship applications not received prior to October 18, 2010.

342.  On information and belief, this vote was not a good faith policy change, but was instead taken to avoid pressure from the Attorney General.

343.  On January 24, 2011, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools voted to temporarily stay their Policy of noncompliance while they sought an injunction against the Attorney General in state court.

344.  On January 24, 2011, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools also indicated that they would seek a declaratory judgment on the constitutionality of the Act.

345. As of April 5, 2011, no such action has been filed and Defendant School Districts have not retracted their January 24 statements. As a result, Parent Plaintiffs are in limbo as they prepare for the coming school year not knowing whether the Defendant School Districts intend to comply with state law in September, 2011.

346. Upon information and belief, Defendant School Districts have deliberately placed Parent Plaintiffs in limbo in order to retaliate against them for accepting a scholarship pursuant to the Act.

347. Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools have colluded to assist each other violate the Act.

348. Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools have agreed to partner in fighting the act in court.

349. Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools have agreed to share their assets–taxpayer dollars paid by the Parent Plaintiffs and others–to pay the legal fees of each district as they attempt to fight the Act.

350. Upon information and belief, Defendant Kirby Lehman has threatened teachers in his district to publicly oppose the Act.

351. Upon information and belief, agents or employees of Defendant Jenks Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

352. Upon information and belief, agents or employees of Defendant Broken Arrow Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

353. Upon information and belief, agents or employees of Defendant Tulsa Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

354. Upon information and belief, agents or employees of Defendant Union Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

355. Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools intend to resume their Policy of noncompliance as soon as practicable in light of their conflict with the Attorney General.

356. Parent Plaintiffs have good reason to fear that they may, without sufficient warning, cease to receive the benefits owed to them under the Act.

357. Upon information and belief, Parent Plaintiffs will not be receiving interest on the money owed to them held unlawfully by the Defendants.

358. Upon information and belief, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools have stated that they anticipate to see the scholarship money that they pay out refunded to them should they defeat Oklahoma's Attorney General in litigation regarding the Act.

359. Upon information and belief, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools intend to seek to force Plaintiffs to repay any scholarship money paid to them under the Act if the dispute with the Attorney General is resolved in Defendants' favor.

360. Defendant School Districts, along with Liberty Public Schools, Bixby Public Schools, and Owasso Public Schools, are the only school districts in the State of Oklahoma to announce refusal to comply with the Act.

361. There are 541 school districts in the State of Oklahoma. Defendant School Districts, Liberty Public Schools, Bixby Public Schools, and Owasso Public Schools (a total of seven districts) comprise just 1.3% of the State's school districts.

362. Upon information and belief, Defendant School Districts will not timely provide Plaintiffs with all of the money due to them under the Act.

363. Upon information and belief, Defendants' efforts to comply with the Act since announcing their temporary suspensions of their policies have not been in good faith.

364. Plaintiff T.K. suffers from Asperger's syndrome, an anxiety disorder, a speech disorder, a sensory processing disorder, and other developmental issues.

365. The Kimerys, the parents of Plaintiff T.K., learned in February 2011 that their scholarship for T.K. will be just approximately $4000 per year because Broken Arrow reported Plaintiff T.K. as having only a speech disorder.

366. Upon information and belief, Defendant Broken Arrow Public Schools reduced or caused the reduction of Plaintiff T.K.'s scholarship to retaliate against Plaintiffs Donald and Nancy Kimery for claiming a scholarship pursuant to the Act.

367. The Kimerys learned from OSDOE in February 2011 that if Defendant Broken Arrow had reported T.K.'s Asperger's syndrome, they would have received approximately $12,000 per year.

368. The Kimerys learned from OSDOE in February 2011 that Defendant Broken Arrow was obligated by federal law to inform them of their right to an IEP re-evaluation in October 2010.

369. On information and belief, the October 2010 IEP re-evaluation that never was would have necessitated that Defendant Broken Arrow add Plaintiff T.K.'s other conditions to his IEP.

370. The Kimerys learned from OSDOE in February 2011 that Defendant Broken Arrow could have but neglected to include in their report to OSDOE Plaintiff T.K.'s occupational therapy and certain other services. The Kimerys also learned that if Defendant Broken Arrow had correctly reported the services to which Plaintiff T.K.'s is entitled, the Kimerys would have received a greater scholarship.

371. Upon information and belief, Defendant Broken Arrow Public Schools changed Platiniff T.K.'s information in OSDOE's system, changed their internal records, or omitted in their report to OSDOE some of the details of T.K's condition, resulting in a reduced calculation by OSDOE.

372. On or about April 5, 2011, the Kimerys learned from Defendant Broken Arrow that any future IEP reevaluations will have no affect on future scholarship payments.

373. Defendant Broken Arrow's declaration that it will not increase scholarship payments in the future that result from a revised IEP has no support in the Act or other law.

374. Defendant Broken Arrow's Policy of not increasing scholarship payments regardless of the results of future IEP reevaluations applies even when it is at fault for an improper, ineffective, or insufficient initial evaluation.

375. According to the OSDOE's regulations, Parent Plaintiffs were entitled to review their "maximum scholarship" calculations in writing no less than thirty business days from the date of their application.

376. None of the Parent Plaintiffs received a written "maximum scholarship" calculation within thirty business days of their application.

377. If those regulations are interpreted, unreasonably, to refer to the date that the Defendant school districts choose to acknowledge the applications (January 24, 2011 for Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools), thirty business days concluded on March 7, 2011.

378. Upon information and belief, Defendants have altered or intend to alter some of the Plaintiffs' records and submit to OSDOE misleading reports in order to reduce the scholarships paid to those Parent Plaintiffs.

379. Plaintiff Marjorie Boyd-Lyons has not received a written "maximum scholarship" calculation.

380. Neither Plaintiff Marjorie Boyd-Lyons nor Town & Country, her child's nonpublic school, has received a scholarship check on behalf of Plaintiff G.B.

381. Defendant Broken Arrow Public Schools sent Plaintiff Marjorie Boyd-Lyons a letter dated February 14, 2011 to inform her that she would not be receiving a scholarship for her daughter.

382. That February 14 letter from Defendant Broken Arrow Public Schools declared that Plaintiff G.B. is not eligible for a scholarship pursuant to the Act because she "was not on an IEP as of October 1, 2009."

383. Defendant Broken Arrow Public Schools misreads the law to the detriment of Plaintiff Marjorie Boyd-Lyons and her minor child, Plaintiff G.B. Neither was granted a hearing to protest Defendant Broken Arrow Public Schools' faulty interpretation.

384. The Act does not require that applicants have an IEP on October 1 the year prior to their application.

385. Rather, the Act requires that applicants "spen[d] the prior school year in attendance at a public school in this state." "Prior school year in attendance" is defined to "mean[] that the student was enrolled in and reported by a school district for funding purposes during the preceding school year."

386. Plaintiff G.B. was enrolled in Defendant Broken Arrow Public Schools in the 2009-2010 school year, which was the school year preceding her scholarship application.

387. Upon information and belief, Defendant Broken Arrow Public Schools reported Plaintiff G.B's enrollment in its schools for funding purposes during the 2009-2010 school year.

388. Plaintiff G.B. is eligible for a scholarship pursuant to the Act.

389. Upon information and belief, Defendant Broken Arrow Public Schools is aware that Plaintiff Marjorie Boyd-Lyons currently suffers from financial distress and has improperly denied a scholarship to Plaintiff G.B. in order to coerce Plaintiff G.B. back into its school system.

390. Upon information and belief, Defendant Broken Arrow Public Schools has denied a scholarship to Plaintiff G.B. to retaliate against Plaintiff Marjorie Boyd-Lyons for claiming a scholarship pursuant to the Act.

391. As of March 10, 2011, Plaintiff Laura Riddick has not received a written "maximum scholarship" calculation.

392. Plaintiff Laura Riddick has been informed that her maximum scholarship is $4139.

51

393. This maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff K.R.'s conditions.

394. Plaintiffs Donald and Nancy Kimery received on approximately 3/4/2011 notice that their "maximium scholarship" calculation is approximately $4357.

395. As noted, this maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff T.K.'s conditions.

396. Neither Plaintiffs Donald and Nancy Kimery nor Town & Country, their child's nonpublic school, has received a scholarship check on behalf of Plaintiff T.K.

397. Plaintiffs Aldo and Michele Eagle received on approximately 2/11/11 notice that their "maximum scholarship" calculation is approximately $10,737.

398. Neither Plaintiff Plaintiffs Aldo and Michele Eagle nor Town & Country, their child's nonpublic school, has received a scholarship check on behalf of Plaintiff J.E.

399. Plaintiffs Stefan and Stephanie Hipskind received on approximately 2/23/11 notice that their "maximum scholarship" calculation is approximately $4000 for their son, Plaintiff A.J.H. and approximately $7000 for their son, Plaintiff L.H.

400. These maximum scholarship calculations are inaccurate for they fail to take into account all of Plaintiff A.J.H.'s conditions and all of Plaintiff L.H.'s conditions.

401. Upon information and belief, Defendant Union Public Schools has reduced or caused the reduction of Plaintiff A.J.H's scholarship and Plaintiff L.H.'s scholarship to retaliate against Plaintiffs Stefan and Stephanie Hipskind for claiming a scholarship pursuant to the Act.

402. Neither Plaintiffs Stefan and Stephanie Hipskind nor Immanuel Christian Academy, their children's nonpublic school, has received a scholarship check on behalf of Plaintiff A.J.H or Plaintiff L.H.

403. Plaintiffs Mike and Amy Howard received on approximately 3/6/11 notice that their "maximum scholarship" calculation is approximately $7096.

404. This maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff B.LR.'s conditions.

405. Upon information and belief, Defendant Broken Arrow Public Schools has reduced or caused the reduction of Plaintiff B.L.R.'s scholarship to retaliate against Plaintiffs Mike and Amy Howard for claiming a scholarship pursuant to the Act.

406. Neither Plaintiffs Mike and Amy Howard nor Town & Country, their child's nonpublic school, has received a scholarship check on behalf of Plaintiff B.L.R.

407. Plaintiffs Joe and Beth Serafin received on approximately 3/4/11 notice that their "maximum scholarship" calculation is approximately $4300.

408. Neither Plaintiffs Joe and Beth Serafin nor Immanuel Christian Academy, their child's nonpublic school, has received a scholarship check on behalf of Plaintiff A.S.

409. Plaintiffs Jerry and Shanna Sneed received on approximately 3/1/11 notice that their "maximum scholarship" calculation is approximately $4387.

410. This maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff B.S.'s conditions.

411. Upon information and belief, Defendant Union Public Schools has reduced or caused the reduction of Plaintiff B.S.'s scholarship to retaliate against Plaintiffs Jerry and Shanna Sneed for claiming a scholarship pursuant to the Act.

412. Neither Plaintiffs Jerry and Shanna Sneed nor Town & Country, their child's nonpublic school, has received a scholarship check on behalf of Plaintiff B.S.

413. Plaintiffs Russell and Stephanie Spry received on approximately 2/18/11 notice that their "maximum scholarship" calculation is approximately $10,000.

414. Neither Plaintiffs Russell and Stephanie Spry nor Town & Country, their child's nonpublic school, has received a scholarship check on behalf of Plaintiff G.S.

415. Plaintiffs Tim and Kimberly Tylicki received on approximately 2/11/11 notice that their "maximum scholarship" calculation is approximately $11,360.

416. The average statewide scholarship for the 2010-11 school year is $6381.

417. The average (mean) scholarship among the Parent Plaintiffs, excluding the Jenks Plaintiffs, is approximately $5110, which is $1271 (or approximately 20%) below the statewide average.

418. On information and belief, this discrepancy is the result of fraud by some of the Defendants.

419. On information and belief, Defendant school districts' failure to act on their January 24, 2011 declaration of intent to sue their Attorney General for a declaratory judgment on the constitutionality of the Act is motivated by a desire to retaliate against, prejudice, or otherwise injure the Plaintiffs as a result of excessive delay.

420. Defendants' actions have caused damages to Plaintiffs in an amount to be determined at trial.

**COUNT I**
**Violation of the United States Constitution**
**First Amendment: Free Exercise**
**(42 U.S.C. § 1983)**

421. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to their free exercise of religion—as secured by the Fourteenth Amendment to the United States Constitution—by denying Plaintiffs, on based upon their religious status or sincerity, the right to funding guaranteed by state statute, by discriminating against them on the basis of their religious views or religious status, and by singling out religious practice for discriminatory treatment.

### COUNT II
**Violation of the United States Constitution**
**Fourteenth Amendment: Equal Protection**
**(42 U.S.C. § 1983)**

422. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by the Fourteenth Amendment to the United States Constitution—by denying Plaintiffs, on the basis of the suspect classification of religion, the right to funding guaranteed by state statute, and by discriminating against them on the basis of religion.

### COUNT III
**Violation of the United States Constitution**
**Fourteenth Amendment: Equal Protection**
**(42 U.S.C. § 1983)**

423. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by the Fourteenth Amendment to the United States Constitution—by discriminating against them on the basis of the disabilities of their children without rational basis.

### COUNT IV
**Violation of the United States Constitution**
**Fourteenth Amendment: Due Process**
**(42 U.S.C. § 1983)**

424. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to property without due process of law by refusing to honor their entitlement to funding granted by a state law that places substantive limitations on official discretion, thus denying Plaintiffs property guaranteed to them without due process of law.

### COUNT V
### Violation of the United States Constitution
### Fourteenth Amendment: Due Process
### (42 U.S.C. § 1983)

425. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to liberty without due process of law by denying them the rights guaranteed to them by duly enacted law for exercising their constitutional right to direct the upbringing and education of their children, and by impermissibly interfering with their liberty to direct the upbringing and education of their children.

### COUNT VI
### Violation of the United States Constitution
### First and Fourteenth Amendments: Freedom of Speech
### (42 U.S.C. § 1983)

426. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to free speech by discriminating against them on the basis of viewpoint as expressed through their decision to attend a nonpublic school.

### COUNT VII
### Violation of Americans with Disabilities Act, Title II
### (42 U.S.C. § 12133)

427. Defendants, government entities acting under color of state law, have discriminated against and threaten to continue to discriminate against Child Plaintiffs by denying them access to public aid designated to accommodate their respective disabilities and excluding them from the benefits of a public program by reason of their disabilities.

## COUNT VIII
### Violation of Rehabilitation Act of 1973, Section 504
### (29 U.S.C. § 794a)

428. Defendants, recipients of federal financial assistance, have discriminated against and threaten to continue to discriminate against Child Plaintiffs by denying them access to public aid designated to accommodate their respective disabilities and excluding them from the benefits of a public program by reason of their disabilities.

## COUNT IX
### Violation of Oklahoma Constitution
### Article 2, Section 7: Due Process

429. Defendants have deprived and threaten to continue to deprive Plaintiffs of their right to property without due process of law by refusing to honor their entitlement to funding granted by a state law that places substantive limitations on official discretion, thus denying Plaintiffs property guaranteed to them without due process of law.

## COUNT X
### Violation of Oklahoma Constitution
### Article 2, Section 7: Equal Protection
### Discrimination on the basis of religious belief

430. Defendants have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by Article 2, Section 7 of the Oklahoma Constitution—by discriminating against them on the basis of the disabilities of their children without rational basis

### COUNT XI
**Violation of Oklahoma Constitution
Article 2, Section 7: Equal Protection
Discrimination on the basis of disability**

431. Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws— as secured by Article 2, Section 7 of the Oklahoma Constitution—by discriminating against them on the basis of the disabilities of their children without rational basis

### COUNT XII
**Violation of the School Code of 1971, Article V
OKLA. STAT. tit. 70, § 5-101, *et seq.*
(OKLA. STAT. tit. 70, § 5-117)**

432.      Defendants have exceeded the powers granted to them by the statutes of the State of Oklahoma, which authorizes them to make rules "not inconsistent with the law." Their *ultra vires* actions have harmed and threaten to continue to harm Plaintiffs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(1)   a declaration that Defendants' actions violate the United States and Oklahoma

Constitutions, and state and federal statutes;

(2)   a permanent injunction requiring Defendants to comply with the law and

disburse scholarships to Plaintiffs;

(3)   compensatory damages;

(4)   costs and attorney's fees; and

(5)   such other further relief that this Court may deem appropriate.

Dated: April 8, 2011                        Respectfully submitted,

John Thetford
*Counsel of Record*
Stipe, Harper, Laizure, Uselton, Belote,
Maxcey & Thetford
2417 E. Skelly Dr.
Tulsa, OK 74170
(918) 749-0749

Meir Katz (*pro hac vice* pending)
Eric Rassbach (*pro hac vice* pending)
Becket Fund for Religious Liberty
3000 K. St., NW, Ste. 220
Washington, DC 20007
(202) 955-0095

*Attorneys for Plaintiffs*