## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

(1) DONALD KIMERY; (2) NANCY
KIMERY; (3) T.K., by and through Donald
and Nancy Kimery; (4) TIM FISHER; (5)
KRISTIN FISHER; (6) K.F., by and through
Tim and Kristin Fisher; (7) STEFAN
HIPSKIND; (8) STEPHANIE HIPSKIND; (9)
L.H., by and through Stefan and Stephanie
Hipskind; (10) A.J.H., by and through Stefan
and Stephanie Hipskind; (11) MIKE
HOWARD; (12) AMY HOWARD; (13) B.L.R.,
by and through Mike and Amy Howard; (14)
CURTIS JOHNSON; (15) JANE JOHNSON;
(16) W.J., by and through Curtis and Jane
Johnson; (17) JERRY SNEED; (18) SHANNA
SNEED; (19) B.S., by and through Jerry and
Shanna Sneed; (20) RUSSELL SPRY; (21)
STEPHANIE SPRY; (22) G.S., by and through
Russell and Stephanie Spry; (23) TIM
TYLICKI; (24) KIMBERLY TYLICKI; (25)
M.T., by and through Tim and Kimberly
Tylicki,

   Plaintiffs,

v.

(1) BROKEN ARROW PUBLIC SCHOOLS;
(2) the BOARD OF EDUCATION OF
BROKEN ARROW PUBLIC SCHOOLS; (3)
JENKS PUBLIC SCHOOLS; (4) the BOARD
OF EDUCATION OF JENKS PUBLIC
SCHOOLS; (5) TULSA PUBLIC SCHOOLS;
(6) the BOARD OF EDUCATION OF TULSA
PUBLIC SCHOOLS; (7) UNION PUBLIC
SCHOOLS; (8) the BOARD OF EDUCATION
OF UNION PUBLIC SCHOOLS,

   Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Case No. 11-CV-0249-CVE-PJC

## FIRST AMENDED COMPLAINT

Above-named Plaintiffs, by and through their attorneys, state as follows:

## NATURE OF ACTION

1.  Plaintiffs are students with special needs and the parents of such students who reside within Defendant school districts. Under a recently enacted state law—the Lindsey Nicole Henry Scholarship for Students with Disabilities Program Act, OKLA. STAT. 70, § 13-101.1, *et seq.*, (hereinafter "the Act")—Plaintiffs should receive state scholarships from Defendants that they can use to attend (or send their children to) a nonpublic school.

2.  However, Defendants have refused, and have adopted a policy of continuing to refuse, to comply with the Act based on their belief that the Act violates the Oklahoma Constitution. In particular, they claim that some of the nonpublic schools that might be attended by special needs children are "sectarian," and that the Act therefore violates the Oklahoma "Blaine Amendment."

3.  Defendants have thus deprived Plaintiffs of the scholarships to which they are entitled under the Act. Plaintiffs seek damages, injunctive relief, and declaratory relief on the ground that Defendants' policy has violated and continues to violate their rights under the United States Constitution, federal civil rights laws, and Oklahoma state law.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction over claims arising under the laws of the State of Oklahoma pursuant to 28 U.S.C. § 1367.

5.  Venue lies in this District pursuant to 28 U.S.C. § 1391(b). All Plaintiffs reside in this District. Defendants' principal places of business are located in this District. The events giving rise to this action occurred within this District.

## PARTIES

A.  **Plaintiffs**

6.  Plaintiff Donald Kimery and Plaintiff Nancy Kimery are the parents of Plaintiff T.K., a minor. For many years, they have actively sought help from Defendant Broken Arrow Public Schools for T.K.'s special needs.

7.   Plaintiff Donald Kimery and Plaintiff Nancy Kimery have another child who is currently a student in the Broken Arrow Public Schools school system.

8.  Plaintiff T.K. spent all of the 2009-10 school year as a student in Defendant Broken Arrow Public Schools' school district. He currently lives within the geographic boundaries of Defendant Broken Arrow Public Schools' school district. He suffers from Asperger's syndrome, an anxiety disorder, a speech disorder, a sensory processing disorder, and other developmental issues. He has received an Individualized Education Program (IEP) from Defendant Broken Arrow Public Schools. He now attends Town & Country, a nonpublic school.

9.  Plaintiff Tim Fisher and Plaintiff Kristin Fisher are the parents of Plaintiff K.F., a minor. For many years, they have actively sought help from Defendant Jenks Public Schools for K.F.'s special needs.

10. Plaintiff Tim Fisher and Plaintiff Kristin Fisher have two other children who are currently students in the Jenks Public Schools school system.

11. Plaintiff K.F. spent all of the 2009-10 school year as a student in Defendant Jenks Public Schools' school district. She currently lives within the geographic boundaries of Defendant Jenks

Public Schools' school district. She suffers from Asperger's syndrome, for which she has received an IEP from Jenks Public Schools. She now attends Metro Christian Academy, a nonpublic non-denominational Christian school.

12. Plaintiff Stefan Hipskind and Plaintiff Stephanie Hipskind are the parents of Plaintiff L.H., a minor, and of Plaintiff A.J.H., a minor. For many years, they have actively sought help from Defendant Union Public Schools for L.H.'s special needs and for A.J.H.'s special needs.

13. Plaintiff Stefan Hipskind and Plaintiff Stephanie Hipskind have two other children who are currently students in the Union Public Schools school system.

14. Plaintiff L.H. spent all of the 2009-10 school year as a student in Defendant Union Public Schools' school district. He currently lives within the geographic boundaries of Defendant Union Public Schools' school district. He suffers from a learning disability, for which he has received an IEP from Defendant Union Public Schools. He now attends Immanuel Christian Academy, a nonpublic religious school affiliated with Immanuel Lutheran Church.

15. Plaintiff A.J.H. spent all of the 2009-10 school year as a student in Defendant Union Public Schools' school district. He currently lives within the geographic boundaries of Defendant Union Public Schools' school district. He suffers from a learning disability, for which he has received an IEP from Defendant Union Public Schools. He now attends Immanuel Christian Academy, a nonpublic religious school affiliated with Immanuel Lutheran Church.

16. Plaintiff Amy Howard is the mother of Plaintiff B.L.R., a minor. Plaintiff Mike Howard is the husband of Amy Howard and legal guardian of Plaintiff B.L.R. For many years, they have actively sought help from Defendant Broken Arrow Public Schools for B.L.R.'s special needs.

17. Plaintiff Amy Howard and Plaintiff Mike Howard have another child who is currently a student in the Broken Arrow Public Schools school system. They have an additional child who is a graduate of Broken Arrow Public Schools.

18. Plaintiff B.L.R. spent all of the 2009-10 school year as a student in Defendant Broken Arrow Public Schools' school district. He currently lives within the geographic boundaries of Defendant Broken Public Schools' school district. He suffers from Asperger's syndrome, Attention-Deficit/Hyperactivity Disorder, and anxiety and mood disorders, for which he has received an IEP from Defendant Broken Arrow Public Schools. He now attends Town & Country, a nonpublic school.

19. Plaintiff Jerry Sneed and Plaintiff Shanna Sneed are the parents of Plaintiff B.S., a minor. For many years, they have actively sought help from Defendant Union Public Schools for B.S.'s special needs.

20. Plaintiff Jerry Sneed and Plaintiff Shanna Sneed have another child who is currently a student in the Union Public Schools school system.

21. Plaintiff B.S. spent all of the 2009-10 school year as a student in Defendant Union Public Schools' school district. He currently lives within the geographic boundaries of Defendant Union Public Schools' school district. He suffers from a learning disability, sensory integration disorder, a speech disorder, and possibly other diagnosed disorders, for which he has received an IEP from Defendant Union Public Schools. He now attends Town & Country, a nonpublic school.

22. Plaintiff Russell Spry and Plaintiff Stephanie Spry are the parents of Plaintiff G.S., a minor. For many years, they have actively sought help from Defendant Jenks Public Schools for G.S.'s special needs.

23. Plaintiff Russell Spry and Plaintiff Stephanie Spry have another child who is currently a student in the Jenks Public Schools school system.

24. Plaintiff G.S. spent all of last school year as a student in Defendant Jenks Public Schools' school district. He currently lives within the geographic boundaries of Defendant Jenks Public Schools' school district. He suffers from Asperger's syndrome, Attention-Deficit/Hyperactivity Disorder, and a mood disorder, for which he has received an IEP from Defendant Jenks Public Schools. He now attends Town & Country, a nonpublic school.

25. Plaintiff Tim Tylicki and Plaintiff Kimberly Tylicki are the parents of Plaintiff M.T., a minor. For many years, they have actively sought help from Defendant Jenks Public Schools for M.T.'s special needs.

26. Plaintiff Tim Tylicki and Plaintiff Kimberly Tylicki are parents of two other children who are currently students in the Jenks Public Schools school system.

27. Plaintiff M.T. spent all of the 2009-10 school year as a student in Defendant Jenks Public Schools' school district. He currently lives within the geographic boundaries of Defendant Jenks Public Schools' school district. He suffers from autism, for which he has received an IEP from Defendant Jenks Public Schools. He now attends Town & Country, a nonpublic school.

28. Plaintiff Curtis Johnson and Plaintiff Jane Johnson are the parents of Plaintiff W.J., a minor. For many years, they have actively sought help from Defendant Tulsa Public Schools for W.J.'s special needs.

29. Plaintiff W.J. spent all of the 2009-10 school year and most of the 2010-11 school year as a student in Defendant Tulsa Public Schools' school district. He currently lives within the geographic boundaries of Defendant Tulsa Public Schools' school district. He suffers from a hearing impairment and partial deafness, a speech disorder, a muscular disorder, and anxiety, for

which he has received an IEP from Defendant Tulsa Public Schools. He now attends St. Pius X Catholic School, a Catholic school affiliated with St. Pius X Catholic Church.

30. Plaintiff Curtis Johnson and Plaintiff Jane Johnson intended to apply in October, 2010, for a scholarship to which they are entitled under the Act. They attended Defendant Tulsa Public Schools' school board meeting in October 2010, in which Tulsa Public Schools announced its intent not to accept any new scholarship applications under the Act.

31. Plaintiff Curtis Johnson and Plaintiff Jane Johnson refrained from applying for a scholarship due to fear of retaliation by Defendant Tulsa Public Schools.

32. Plaintiff Curtis Johnson, Plaintiff Jane Johnson, and Plaintiff W.J. would like for W.J. to attend a private Christian school that can properly address W.J.'s special needs and also provide him with a Christian and moral education.

33. Plaintiff Curtis Johnson and Plaintiff Jane Johnson submitted a scholarship application on or about March 11, 2011 and learned on or about March 26, 2011 that their scholarship application had been approved. They have yet to receive a scholarship check from Defendant Tulsa Public Schools pursuant to the terms of the Act.

**B.**      **Defendants**

34. Defendant Broken Arrow Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 3 of Tulsa County, Oklahoma.

35. Defendant Board of Education of Broken Arrow Public Schools controls Broken Arrow Public Schools' compliance with the terms of the Act. Defendant Board of Education of Broken Arrow Public Schools can sue and be sued pursuant to Oklahoma law.

36. Jarod Mendenhall is the Superintendent of Defendant Broken Arrow Public Schools. He is the chief officer of the District and is responsible for administering Board policies.

37. Mendenhall has final decision-making authority within his school district.

38. Upon information and belief, Mendenhall has taken affirmative steps to prevent Plaintiffs from receiving the full amount due to them by law or has otherwise attempted to frustrate their efforts.

39. Upon information and belief, Mendenhall and/or other decision-makers within Defendant Broken Arrow Public Schools received legal advice or analysis prior to engaging in some of the illegal acts alleged in this Complaint. They were advised not to engage in those acts.

40. Upon information and belief, Mendenhall and/or other decision-makers within Defendant Broken Arrow Public Schools were informed by legal counsel, prior to engaging in some of the illegal acts alleged in this Complaint, that the districts' attorneys' advice regarding the constitutionality of the Act is not supported in the law.

41. Defendant Jenks Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 5 of Tulsa County, Oklahoma.

42. Defendant Board of Education of Jenks Public Schools controls Jenks Public Schools' compliance with the terms of the Act. Defendant Board of Education of Jenks Public Schools can sue and be sued pursuant to Oklahoma law

43. Kirby Lehman is the Superintendent of Defendant Jenks Public Schools. He is the chief officer of the District and is responsible for administering Board policies.

44. Lehman has final decision-making authority within his school district.

45. Upon information and belief, Lehman has taken affirmative steps to prevent Plaintiffs from receiving the full amount due to them by law or has otherwise attempted to frustrate their efforts.

46. Upon information and belief, Lehman and/or other decision-makers within Defendant Jenks Public Schools received legal advice or analysis prior to engaging in some of the illegal acts alleged in this Complaint. They were advised not to engage in those acts.

Upon information and belief, Lehman and/or other decision-makers within Defendant Jenks Public Schools were informed by legal counsel, prior to engaging in some of the illegal acts alleged in this Complaint, that the districts' attorneys' advice regarding the constitutionality of the Act is not supported in the law.

47. Defendant Tulsa Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 1 of Tulsa County, Oklahoma.

48. Defendant Board of Education of Tulsa Public Schools controls Tulsa Public Schools' compliance with the terms of the Act. Defendant Board of Education of Tulsa Public Schools can sue and be sued pursuant to Oklahoma law

49. Keith Ballard is the Superintendent of Defendant Tulsa Public Schools. He is the chief officer of the District and is responsible for administering Board policies.

50. Ballard has final decision-making authority within his school district.

51. Upon information and belief, Ballard has taken affirmative steps to prevent Plaintiffs from receiving the full amount due to them by law or has otherwise attempted to frustrate their efforts.

52. Upon information and belief, Ballard and/or other decision-makers within Defendant Tulsa Public Schools received legal advice or analysis prior to engaging in some of the illegal acts alleged in this Complaint. They were advised not to engage in those acts.

Upon information and belief, Ballard and/or other decision-makers within Defendant Tulsa Public Schools were informed by legal counsel, prior to engaging in some of the illegal acts alleged in this Complaint, that the districts' attorneys' advice regarding the constitutionality of the Act is not supported in the law.

53. Defendant Union Public Schools is an independent school district established pursuant to the laws of Oklahoma. Its official name is Independent School District Number 9 of Tulsa County, Oklahoma.

54. Defendant Board of Education of Defendant Union Public Schools controls Union Public Schools' compliance with the terms of the Act. Defendant Board of Education of Union Public Schools can sue and be sued pursuant to Oklahoma law.

55. Kirt Hartzler is the Associate Superintendent of Defendant Union Public Schools and reports directly to Cathy Burden.

56. Hartzler has considerable decision-making authority within his school district.

57. Cathy Burden is the Superintendent of Defendant Union Public Schools. She is the chief officer of the District and is responsible for administering Board policies.

58. Burden has final decision-making authority within her school district.

59. Upon information and belief, Burden and/or Hartzler have taken affirmative steps to prevent Plaintiffs from receiving the full amount due to them by law or have otherwise attempted to frustrate their efforts.

60. Upon information and belief, Burden, Hartzler, and/or other decision-makers within Defendant Union Public Schools received legal advice or analysis prior to engaging in some of the illegal acts alleged in this Complaint. They were advised not to engage in those acts.

61. Upon information and belief, Burden, Hartzler, and/or other decision-makers within Defendant Union Public Schools were informed by legal counsel, prior to engaging in some of the illegal acts alleged in this Complaint, that the districts' attorneys' advice regarding the constitutionality of the Act is not supported in the law.

## STATEMENT OF FACTS

A.      The Act

62. The Lindsey Nicole Henry Scholarship for Students with Disabilities Program Act, OKLA. STAT. 70, § 13-101.1, *et seq.*, (hereinafter "the Act") gives certain students with disabilities the right to receive a scholarship from the State of Oklahoma to facilitate their attendance in a participating nonpublic school.

63. The Act entered into force on August 27, 2010 and was amended on May 26, 2010.

64. The Act does not place discretion in the hands of the school districts. It gives parents who meet specified parameters the right to apply for a scholarship and mandates school districts to comply with its terms.

65. To be eligible, students must have (1) spent the school year prior to their application in attendance at a public school, (2) received an Individualized Education Program (IEP) for their disability, (3) gained (through their parents) acceptance in a participating nonpublic school and (4) applied (through their parents) for a scholarship not later than December 1 of the school year in which they desire a scholarship.

66. Once eligible for a scholarship, a student continues to be eligible for a scholarship until he (1) returns to public school, (2) graduates from high school, or (3) reaches the age of twenty-two.

67. The Act expressly provides for continued eligibility for the purpose "of continuity of educational choice." Upon information and belief, the drafters wanted to ensure that students, once eligible for a scholarship, would not be forced back into their former public school systems on the theory that doing so would disrupt their educational and emotional development.

68. The Act imposes upon nonpublic schools a series of detailed requirements and qualifications as a condition for eligibility. Specifically, to be eligible, a nonpublic school must (1) apply for eligibility, (2) specify the grade levels and services that it has available for students with special needs, (3) demonstrate that it meets certain accreditation requirements, (4) demonstrate fiscal stability, (5) demonstrate compliance with the antidiscrimination provisions of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, (6) demonstrate compliance with certain health and safety codes, (7) be academically accountable to the parent or guardian of participating children, (8) employ teachers with specified minimum credentials, (9) demonstrate compliance with state laws regulating nonpublic schools, and (10) demonstrate compliance with its published disciplinary procedures.

69. The Act also subjects nonpublic schools to a series of governmental controls and safeguards. Specifically, under the Act, the government has authority to (1) review the applications of nonpublic schools and reject them largely at its discretion, (2) review the fiscal soundness of an applicant nonpublic school, (3) ensure that nonpublic schools are in compliance with various safety laws and codes, (4) require that nonpublic schools satisfy the accreditation requirements of the Oklahoma State Department of Education (OSDOE) or another accrediting

association approved by the OSDOE, (5) review the qualifications of the teachers at a participating nonpublic school, (6) review a nonpublic school's compliance with its own disciplinary procedures relating to the expulsion of a student, and (7) require that participating parents agree to comply with their nonpublic school's parental involvement requirements.

70. The Act thus imposes significant costs on nonpublic schools in addition to the general costs of educating a child.

71. In order to reimburse these schools for those significant costs, the Act supplies Child Plaintiffs with a scholarship that they can use to offset a portion of the costs of their education, thus ensuring their ability to pay full tuition or an amount close to full tuition.

72. The Act requires participating students to maintain attendance throughout the school year unless excused for good cause and to comply with the school's code of conduct.

73. The Act similarly requires parents of participating students to timely request a scholarship and comply with their school's parental involvement requirements.

74. Prior to the May 2011 amendments, the Act required school districts to (1) annually report to the State the names of the students who participate in the scholarship program, (2) verify acceptance and enrollment in a participating nonpublic school on a quarterly basis, and (3) provide the scholarship funding as described in the next four paragraphs.

75. Prior to the May 2011 amendments, the Act required school districts to issue scholarships pursuant to the terms of Act to the parent(s) or guardian(s) of eligible children. The named parent(s) or guardian(s) were required to endorse their checks to their child's participating nonpublic school.

76. Accordingly, no money flowed from the school district directly to the nonpublic school; all money first goes to the parents and is directed by them to the school of their true private choice.

77. Prior to the May 2011 amendments, the Act specified that scholarships were to be equivalent to the sum of state funds allocable to the student-applicant. Namely, the scholarship is calculated by adding (1) "the local and county revenue for the school district which is chargeable in the State Aid formula," (2) "state-dedicated revenue," and (3) "state-appropriated funds per weighted average daily membership generated by that student for the applicable school year." However, the scholarship amount was not to be greater than the tuition and fees of the participating student's nonpublic school.

78. The Act further indicated that the weighted average daily membership was to be calculated using a grade multiplier (that is, a numerical factor assigned to each grade level) and a disability multiplier (that is, a numerical factor assigned to each disability), both of which are supplied by the school district to the OSDOE.

79. As amended, the Act places responsibility over issuing scholarship checks with the OSDOE. It is to issue checks to the parent(s) or guardian(s) of eligible children. Parents are required to endorse their checks to their child's participating nonpublic school.

80. Accordingly, no money flows from the school district directly to the nonpublic school; all money first goes to the parents and is directed by them to the school of their true private choice.

81. The formula prescribed by the Act merely takes state funds allocable to the education of the eligible child and enables those funds to follow the child to an eligible nonpublic school.

82. As amended, the Act continues to rely on grade and disability multipliers (numerical factors assigned to each grade level and disability, respectively).

83. Upon information and belief, the OSDOE remains dependent upon the cooperation of the school districts to provide it with accurate information so that it can properly perform the scholarship calculation as mandated by the Act.

84. The formula does not adjust Defendant School Districts' per-pupil state funding.

85. Prior to the May 2011 amendments, a school district had permission to retain as much as 5% of the scholarship amount as an administrative fee.

86. Upon information and belief, the Defendant School Districts retained the full 5% fee for each of their applicants.

87. Upon information and belief, the 5% administrative fee is greater than the actual costs of administering the program. Accordingly, the Act supplied school districts with additional funds.

88. As amended, the Act permits the new administrator of the program, the OSDOE, to retain an administrative fee of up to 2.5% of the scholarship amount.

89. The Act does not impose new liabilities on the State.

90. The Act expressly exempts school districts from having to shoulder additional costs, including for equipment and materials. It also exempts school districts from liability pursuant to their issuance of a scholarship under the Act.

91. The Act expressly exempts school districts from shouldering the costs of transportation to and from the nonpublic schools of scholarship recipients.

92. The Oklahoma State Department of Education (OSDOE) issued regulations under the Act prior to the May 2011 amendments.

93. The regulations specified that school districts are to make payments in arrears on a quarterly basis.

94. The regulations also specified that within ten business days of receiving an application for a scholarship, a school district is obligated to request that the OSDOE calculate the student's maximum scholarship and notify the parents "of the maximum amount of the scholarship in writing in a timely manner, not to exceed thirty business days from the [original application]."

95. The Act, as amended, grants the OSDOE the authority to enforce its provisions.

96. The Act, as amended, grants the OSDOE the right to make retrospective findings relating to prior violations of the Act, and to deprive school districts of funds that should have gone to parents pursuant to the terms of the Act. The relevant section of the Act reads as follows:

> If the State Department of Education determines that a school district prior to the effective date of this act has failed to comply with the provisions of the Lindsey Nicole Henry Scholarships for Students with Disabilities Program Act and has failed to make full or partial scholarship payments for eligible students, the Department shall have authority to reduce the amount of State Aid allocated to the school district or require the school district to make repayment to the Department of State Aid allocations in an amount equal to the amount of scholarship payments the school district failed to make.  The Department shall make payment to the parent or legal guardian in the amount the school district failed to make in the manner as provided for in subsection J of this section.

## B.        The Act's Legislative History

97. Supporters of the Act introduced the bill (H.B. 3393) as a measure specifically designed to assist students with special needs.

98. Some of the Representatives who opposed the bill spoke about potential state constitutional infirmities. For example, Representative Jordan from the Jenks district noted that a similar scholarship program was previously stuck down by the Arizona Supreme Court on state constitutional grounds. He noted that "[a]fter a long and expensive legal battle, they declared that the scholarship program . . . violated the state's constitution Blaine Amendment, which is the exact same thing we have in Oklahoma under Art. II, § 5" and then commented that the Arizona decision "ought to cause some concern" for Oklahoma lawmakers.

99. Representative Jordan also noted that Defendant Jenks Public Schools has 1954 students on an IEP, indicating that this bill threatens to take a lot of money out of Defendant Jenks' budget.

100.    Members in the House argued over whether the Act would result in a net savings to the school districts or a net loss.

101.    Many Members argued that because the school districts (by their own admission) actually pay more than they receive for special needs children, the bill actually saves the districts money.

102.    Additionally, the Act will result in smaller class sizes and reduced administrative expenses for the school districts.

103.    And the Act will remove some students with special needs from the classroom. The students, by virtue of various behavioral and other disorders, might serve as a distraction in the classroom. Their absence may improve the educational opportunities of the other students remaining in the classroom.

104.    Speaker *Pro Tempore* Steele, a former public school teacher, said:  "I am a proponent of public education. I think most of you know my dad is currently a superintendant at Jones schools. . . . I am a proponent of public education but I am not for protecting the status quo." He later added:  "School districts tell me that they lose money with special needs children because they don't receive enough in state aid to actually meet the needs that are adequate for these students. I believe that by capping the amount of this scholarship, we can actually help school districts save money."

105.     Representative Nelson noted that the legal staff in the OSDOE reviewed and approved of the bill, as did Governor Henry's office. Nelson further noted that Governor Henry is a committed supporter of public education and nevertheless supported the Act.

106.     Senators debating the measure were similarly divided on whether H.B. 3393 would be good or bad for public education.

107.     The Senate sponsor, Senator Anderson, noted that he is "a product of public education" who sends his children to public schools. He said that the measure had been reviewed by Sandy Garrett, then-State Superintendant of Public Instruction, a Democrat, and that the version of the bill that ultimately passed incorporated her comments.

108.     On May 21, 2010, the Oklahoma House approved H.B. 3393 by a vote of 54 to 46. The Senate approved it on May 26 by a vote of 25 to 22.

109.     The Defendant School Districts failed to comply with the Act following its passage, as described below.

110.     As a result, Representative Nelson and others introduced a series of amendments in a bill known has HB 1744.

111.     The Oklahoma House approved those amendments on May 18, 2011 by a vote of 76 to 19. The Senate approved them on May 19, 2011, by a vote of 36 to 9. They were signed into law by Governor Mary Fallin on May 26, 2011.

112.     Explaining the need for the amendments, Representative Nelson, the primary House sponsor of both the original bill and the 2011 amendments, commented:  "Last year, several school districts failed to provide scholarships to eligible special needs students, flagrantly violating the law." He added that these amendments "will provide consistency and certainty for students and parents who choose to participate in the program."

113.    Representative Nelson additionally said about the 2011 amendments:  "I've been stunned by the contempt some school districts have shown toward the law and these children. . . . I'm told by parents that some local districts, in addition to ignoring the new law, are attempting to ignore existing transfer laws in order to deny scholarship to eligible students and have resorted to telling parents that the scholarships are taxable, hoping that will keep them from participating in the program. House Bill 1744 will ensure *rogue officials* don't continue to cause problems for these students and their parents." (emphasis added).

114.    Upon information and belief, Representative Nelson's references to "rogue officials" and to several school districts are directed at those with final decision-making authority for the Defendants in this litigation.

115.    Upon information and belief, Defendants' illegal actions inspired the May 2011 amendments, which passed overwhelmingly in both chambers of the state legislature.

**C.      Defendant School Districts' Policy of Noncompliance**

116.    The Act was signed into law on May 28, 2010.

117.    Each of the Parent Plaintiffs applied for scholarships under the Act.

118.    Each of the Child Plaintiffs had applications for scholarships made in his or her name.

119.    Some of the Parent Plaintiffs applied for scholarships as early as June.

120.    For many months following, the Defendants did nothing to suggest that they would not comply with the Act. Indeed, nearly all of the Parent Plaintiffs believed at the time they applied for a scholarship that they would receive one.

121.    Plaintiffs Stefan Hipskind and Stephanie Hipskind had email correspondence with Defendant Union Public Schools as late as August 18, 2010. That correspondence clearly

indicated an intent to comply with the Act ("Once all procedures are established, we will be in touch with you *and abide by those procedures*." (emphasis added)).

122.    Plaintiff Amy Howard received email correspondence with Defendant Broken Arrow Public Schools as late as September 30, 2010, which suggested that Defendant Broken Arrow Public Schools still intended to comply with the Act.

123.    According to the OSDOE's regulations promulgated pursuant to the original 2010 enactment of the Act, Parent Plaintiffs were entitled to review their "maximum scholarship" calculations in writing no less than thirty business days from the date of their application.

124.    None of the Parent Plaintiffs received a written "maximum scholarship" calculation within thirty business days of their application.

125.    On or about the last week of October 2010, Defendant Jenks Public Schools sent a mailing to all of its scholarship applicants stating that it believed that the Act is unconstitutional and expressing its policy of noncompliance.

126.    Jenks enclosed a "Position Statement" in the mailing.

127.    The Jenks Position Statement is materially identical to a letter written by Attorney Doug Mann to the Oklahoma Bar Association in response to a grievance filed against him.

128.    In that letter, Mann indicates that he advised seven Tulsa County school districts on the constitutionality of the Act.

129.    Upon information and belief, those seven school districts, including Defendant School Districts, did not seek a second opinion from outside attorneys with expertise in constitutional law before announcing their intentions not to comply with the Act.

130.    Upon information or belief, the seven school districts, including Defendant School Districts, decided not to comply with the Act by relying exclusively or primarily on the advice of Mann.

131.    Among the seven school districts named in Mann's letter are Defendants Broken Arrow, Jenks, Tulsa, and Union Public Schools.

132.    In his letter, Mann argues that the Act (1) violates one of Oklahoma's Blaine Amendments (OKLA. CONST. art. II, § 5); (2) the Act interferes with the state's obligation to establish and maintain a free public school system as mandated by Oklahoma's other Blaine Amendment (OKLA. CONST. art. I, § 5) and OKLA. CONST. art. XIII, § 1; (3) the Act mandates school districts to give their parents a "gift" in violation of OKLA. CONST. art. X, § 15; and (4) the Act distinguishes between different classes of students that he deems "identically situated."

133.    Defendant Broken Arrow Public Schools issued a press release on January 24, 2011, repeating many of Mann's arguments.

134.    The January 24 press release also cites several policy justifications for noncompliance.

135.    The January 24 release states, as a justification for noncompliance, that "private schools are able to be selective in their enrollment process."

136.    The January 24 press release states, as a justification for noncompliance, that "the eight scholarship requests currently on record with the Broken Arrow school district will cost $40,000."

137.    In the 2008-09 school year, Defendant Broken Arrow Public Schools had a student enrollment of approximately 16,200.

138.     The January 24 press release states that Defendant Broken Arrow Public Schools is prepared to spend "$1.56 per student over the course of" their legal battles against the Act.

139.     $1.56 spent on each of 16,200 students would result in a total amount of $25,272.

140.     Upon information and belief, Defendant Broken Arrow Public Schools will spend much more than $25,272 in attorney's fees, expenses, employee time, and official time litigating against and otherwise objecting to the Act.

141.     Upon information and belief, Defendant Broken Arrow Public Schools has already spent more than $25,272 in attorney's fees, expenses, employee time, and official time litigating against and otherwise objecting to the Act.

142.     In a January 24, 2011 public statement, Mendenhall, Superintendent of Broken Arrow Public Schools, offered a legal opinion about the Act's constitutionality on behalf of Broken Arrow Public Schools.

143.     In his January 24 public statement, Mendenhall stated that "[the Act] is in direct violation of the Oklahoma State Constitution."

144.     Mendenhall also stated that "[the Act] strikes a blow to both the Oklahoma Constitution and to public school districts across the state."

145.     In a January 24, 2011 public statement, Lehman, Superintendent of Jenks Public Schools, offered a legal opinion about the Act's constitutionality on behalf of Jenks Public Schools.

146.     In his January 24 public statement, Lehman stated that "[the Act] is unconstitutional."

147.     In his January 24 public statement, Lehman also declared that the Act's "primary flaw is that the payment of taxpayer funds . . . to private sectarian school [sic] violates Article II,

section 5 of the Oklahoma Constitution [sic] which precludes the use of public taxpayer funds, directly or indirectly, for the use, benefit, or support of sectarian institutions."

148.    In his January 24 public statement, Lehman also stated that noncompliance with a duly enacted but unconstitutional law is unactionable. Lehman cited a 1940 Oklahoma state court decision as the basis for his legal opinion.

149.    The 1940 decision cited by Lehman indicates that disobedience against a law that has been judicially declared unconstitutional cannot be punished.

150.    The 1940 decision does not sanction or give license to any government officials who dislike a particular law to declare it "unconstitutional" and act as they choose.

151.    In a January 24, 2011 public statement, Burden, Superintendent of Union Public Schools, offered a legal opinion about the Act's constitutionality on behalf of Union Public Schools.

152.    In her January 24 public statement, Burden declared conclusively that "[t]he constitutions of this nation and this state demand a clear separation between church and state and numerous articles in the Oklahoma State Constitution make it abundantly clear that tax dollars cannot be diverted to fund private school systems or those associated with a religious institution."

153.    In her January 24 public statement, Burden also stated that the Act is "about selfish motives that benefit only one child." Burden also claimed that the Act will "siphon off financial resource[s], parent support, and specific student talent[]" from public school systems.

154.    Defendant Board of Education of Jenks Public Schools resolved not to comply with the Act on October 4, 2010.

155.     Upon information and belief, the primary purpose of Defendant Jenks Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

156.     Lehman's annual salary, which is funded by Defendant Jenks Public Schools, could fund the scholarship for all of his district's applicants under the Act for more than two years.

157.     When enacting its policy, Defendant Jenks Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

158.     When enacting its policy, Defendant Jenks Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in its school system.

159.     Defendant Jenks Public Schools did not attempt to evaluate what would be in the best interests of Plaintiffs G.S., K.F., and M.T. in deciding to not to comply with the Act.

160.     Defendant Jenks Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

161.     Defendant Board of Education of Broken Arrow Public Schools resolved not to comply with the Act on October 4, 2010.

162.     Upon information and belief, the primary purpose of Defendant Broken Arrow Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

163.     Mendenhall's annual salary, which is funded by Defendant Broken Arrow Public Schools, could fund the scholarship for all of his district's applicants under the Act for more than two years.

164.    When enacting its policy, Defendant Broken Arrow Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

165.    When enacting its policy, Defendant Broken Arrow Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in its school system.

166.    Defendant Broken Arrow Public Schools did not attempt to evaluate what would be in the best interests of Plaintiffs G.B., B.L.R., and T.K. in deciding to not to comply with the Act.

167.    Defendant Broken Arrow Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

168.    Defendant Board of Education Union Public Schools resolved not to comply with the Act on October 11, 2010.

169.    Upon information and belief, the primary purpose of Defendant Union Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

170.    Burden's annual salary, which is funded by Defendant Union Public Schools, could fund the scholarship for all of her district's applicants under the Act for more than two years.

171.    When enacting its policy, Defendant Union Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

172.    When enacting its policy, Defendant Union Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in its school system.

173.    Defendant Union Public Schools did not attempt to evaluate what would be in the best interests of Plaintiffs L.H., A.J.H., and B.S. in deciding to not to comply with the Act.

174.    Defendant Union Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

175.    The Board of Education of Bixby Public Schools resolved not to comply with the Act on October 11, 2010.

176.    On October 12, Owasso Public Schools became the fifth Tulsa-area school district to adopt a policy of noncompliance with the Act.

177.    Upon information and belief, Liberty Public Schools also adopted a policy of noncompliance.

178.    Defendant Board of Education Tulsa Public Schools resolved not to comply with the Act on October 18, 2010 with respect to those applications not yet received.

179.    Upon information and belief, the primary purpose of Defendant Tulsa Public Schools' policy of noncompliance with the Act is obtaining the greatest possible amount of federal and state taxpayer funds.

180.    Ballard's annual salary, which is funded by Defendant Tulsa Public Schools, could fund the scholarship for all of his district's applicants under the Act for more than two years.

181.    When enacting its policy, Defendant Tulsa Public Schools displayed a lack of concern for the education and wellbeing of the Child Plaintiffs.

182.    When enacting its policy, Defendant Tulsa Public Schools did not take into consideration the academic regression that Child Plaintiffs experienced while students in its school system.

183.    Defendant Tulsa Public Schools did not attempt to evaluate what would be in the best interests of Plaintiff W.J. in deciding to not to comply with the Act.

184.    Defendant Tulsa Public Schools did not anticipate the academic acceleration that the Child Plaintiffs would experience upon enrolling in nonpublic school.

185.    On or about June 1, 2011, Defendant Broken Arrow Public Schools explained its decision not to comply with the Act, a law duly enacted by the state legislature. It said that it has "philosophical issue[s]" with the Act.

186.    Upon information and belief, Broken Arrow Public School's philosophical issues govern its actions with regard to the Act more than does reason, law, or the best interests of its students.

187.    Upon information and belief, attorney Doug Mann is counsel to each of the Defendant School Districts, as well as to Bixby Public Schools, Liberty Public Schools, and Owasso Public schools.

188.    Mann's direct involvement in this matter has been reported by Oklahoma media outlets.

189.    Mann's actions have harmed the public image of attorneys in the State of Oklahoma.

190.    Upon information and belief, the grievance filed against Mann referred to in paragraph 127 was filed in response to the harm that Mann, through his professional actions, is inflicting upon the legal profession in Oklahoma.

191.    In their Motion to Dismiss (Dkt. No. 37) and brief in support of that motion (Dkt. No. 38), Defendants confirm that they believe that the Act is unconstitutional and attempt to excuse their noncompliance with it on the grounds that it is facially invalid.

**D.**         **Oklahoma's Blaine Amendments**

192.     As noted, Defendants rely heavily on, as a justification for their noncompliance with the Act, Oklahoma's Blaine Amendments, OKLA. CONST. art. I § 5, and art. II, § 5.

193.     The Blaine Amendments prohibit the use of state property in the support of "sectarian" institutions and certain other "sectarian" purposes.

194.     When they were enacted, the word "sectarian," and the general thrust of the 'Blaine' provisions, was understood as an impediment on a particular religious minority:  Roman Catholics.

195.     The use of the word "sectarian" to mean "Catholic" was documented in Oklahoma at around the time of the state's founding. *See*, *e.g.*, *Indian Schools*, INDIAN ADVOCATE 62, 63 (Feb. 1904).

196.     The Blaine Amendments were part of a broad trend, which long pre-dated Oklahoma's statehood, to use law to marginalize the growing Catholic community in the United States.

197.     These provisions came to be known by the name "Blaine Amendments" because of their relationship to the 1875 Speaker of the United States House of Representatives, James G. Blaine.

198.     Speaker Blaine proposed an amendment to the Federal Constitution that would have imposed a bar to funding to certain "sectarian" organizations.

199.     The debates of the floor on the United States Senate, in which Senators were discussing the merits of Blaine's proposed amendment, repeatedly referred to the Roman Catholic Church.

200.     Senators who supported the amendment used rhetoric such as the following:

> [T]here is a large and growing class of people in this country who are utterly opposed
> to our present system of common schools . . . . The liberty of conscience, while it is
> universal in every church but one, is not a liberty of conscience to stand in the way of
> [the development of public highways and common schools] . . . . The supposed
> infallibility of the Holy Father would be a sufficient refutation of the suggestion [that
> the Catholic Church advances religious liberty], for it is the greatest maxim of the
> executive affairs in that hierarchy, *semper eadem*–it never changes . . . . [T]hese
> dogmas [of intolerance] . . . are at this moment the earnest, effective, active dogmas
> of the most powerful religious sect that the world has ever known, or probably ever
> will know–a church that is universal, ubiquitous, aggressive, restless, and untiring.

4 CONG. REC. 5585, 87, 88 (1876).

201.     Although the Federal Blaine Amendment did not become law, it was followed by similar proposals in many states. Blaine's supporters turned to the state legislatures to enact similar provisions in their state constitutions. Their ideological predecessors (dating back to the 1840s) and heirs (dating up to the early twentieth century) managed to get forty-one states to adopt a state version of the Blaine Amendment.

202.     Virtually all of the Blaine Amendments, including Oklahoma's, were enacted during a period in the late eighteenth century and early nineteenth century of severe nativism, xenophobia, and religious strife in which much legal action was motivated by hostility towards Catholics.

203.     The Supreme Court in *Mitchell* v. *Helms*, 530 U.S. 793, 828-29 (2000), condemned the ideological doctrines embodied by the Blaine Amendments in strong terms, stating that they have a "shameful pedigree," were "born of bigotry," and "should be buried now."

204.     Anti-Catholicism in Oklahoma's early history is manifested not just in its Blaine Amendments but in other legal arenas as well.

205.     For example, Oklahoma's prohibition of alcohol during the early twentieth century was motivated primarily by anti-Catholicism.

206.     As one scholar recently explained, prohibition "was part of a pattern of anti-Catholic sentiment that flourished in early twentieth-century Oklahoma. Groups, such as the Guardians of Liberty and the Knights of Luther, formed to foil alleged Catholic plots to overthrow the federal and state governments." James Edward Klein, Grappling with Demon Rum: The Cultural Struggle over Liquor in early Oklahoma 87 (2008).

207.     Early public schools in the United States were dominated by nondenominational Protestant theology and values.

208.     Horace Mann, referred to by many as the "father of public education," advocated for public schools that advanced a "vague and inclusive Protestantism" and required daily Bible reading.

209.     The Bible commonly used in the public schools of the early twentieth century was not any Bible of a students' (or his parents') choosing, but the King James Bible. Jewish and Catholic public school students, who largely objected to the use of the King James Bible, were often nevertheless required to join their class as they read from a Protestant version of the Bible.

210.     Oklahoma's early public schools were no less religious than those of the rest of the country.

211.     Oklahoma's early public schools used the McGuffey Readers.

212.     The McGuffey Readers seek to indoctrinate students with Protestant morality and religious thought.

213.     Religious Protestants maintained a strong influence over the school system throughout Oklahoma's early decades.

214.     That heavy Protestant influence in Oklahoma's early public schools was influential in the 1923 decision to ban the teaching of evolution in Oklahoma's public schools.

215.    The banner of anti-Catholicism in Oklahoma's public schools was carried prominently by the Ku Klux Klan in the 1920s.

216.    One of Oklahoma's Blaine Amendments was mandated by Congress. The Enabling Act of the State of Oklahoma of 1906, Pub. L. No. 59-234, ch. 3335, § 510, 34 STAT. 267, 270-71 (1906), required, as a condition on statehood, Oklahoma to adopt in its original constitution a provision requiring "the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control . . . ."

217.    The Enabling Act Congress had the same nefarious anti-Catholic motives as the Congress that attempted to pass the Federal Blaine Amendment.

218.    The Enabling Act Congress sought to defund Catholic education.

219.    Congress had a history of disenfranchising Catholics in the Indian and Oklahoma Territories (which would later become the State of Oklahoma).

220.    Congress originally funded missionary churches in Indian Territory in its patronizing attempts to Christianize Native American communities. W. DAVID BAIRD AND DANNEY GOBLE, OKLAHOMA: A HISTORY 138 (2008). However, once it became evident in 1896 that most of those government funds were going to Catholic mission schools, Congress revoked funding of "sectarian" schools. *No Sectarian Support*, N.Y. TIMES, Feb. 25, 1896.

221.    The word "sectarian" in the Enabling Act provision was, as the Supreme Court has said, widely recognized as "code for 'Catholic.'" *Mitchell* v. *Helms*, 530 U.S. 793 (2000).

222.    The word "sectarian" in the Enabling Act provision was recognized by the Indian and Oklahoma Territories as code for Catholic.

223.     Oklahoma's Blaine Amendments were not bans on religious control of schools or the teaching of religious doctrine. They were instead attempts to marginalize Catholics and make the practice of Catholicism as difficult as possible.

224.     OKLA. CONST. art. I, § 5 is the codification of the language in the Enabling Act and reflects the intent of the Enabling Act.

225.     OKLA. CONST. art. II, § was enacted with the purpose of anti-Catholicism by prohibiting, on the basis of "sectarian" identity, certain types of direct and indirect aid.

**E.        Harms Inflicted by Defendant School Districts**

226.     Many of the Plaintiffs cannot afford to keep their children in nonpublic school, but have resolved that they will find a way to do so anyway, even at great cost and personal sacrifice.

227.     Because of Defendants' refusal to carry out the provisions of the Act, and Plaintiffs' financial hardship, some of the nonpublic schools attended by Child Plaintiffs allowed Child Plaintiffs to attend for free or at significantly reduced cost.

228.     Child Plaintiffs L.H., B.L.R., B.S., and M.T., struggled academically and performed below their ability as a result of the educational services they received in public school.

229.     Child Plaintiffs A.J.H. and T.K. regressed academically as a result of the educational services they received in public school.

230.     Without the benefits of the Act, many of the Parent Plaintiffs would have to send their children back to their former public schools.

231.     Re-enrollment in public school would be highly detrimental to the Child Plaintiffs.

232.     Parent Plaintiffs fear for their children should they have to re-enroll in public school.

233.     Upon information and belief, Defendants have not undertaken any evaluation of whether re-enrollment in public schools would be in the best interests of the Child Plaintiffs.

234.     Defendants' public schools are, in some cases, unsafe for the Child Plaintiffs.

235.     Defendants' public schools do not, in some cases, have adequate resources to meet the needs of the Child Plaintiffs.

236.     Defendants' public schools are not, in some cases, properly staffed to meet the needs of the Child Plaintiffs.

237.     Staff members at Defendants' public schools are, in some cases, not properly trained to meet the needs of the Child Plaintiffs.

238.     Staff members at Defendants' public schools are, in some cases, not sufficiently patient to meet the needs of the Child Plaintiffs.

239.     Staff members at Defendants' public schools are not adequately trained to meet the needs of the Child Plaintiffs.

240.     Defendants' schools are unwilling to properly accommodate Child Plaintiffs.

241.     Defendants' schools are unwilling to meet the needs of Child Plaintiffs.

242.     On or about June 13, 2011, after receiving Plaintiff's original Complaint (Dkt. No. 2) and being informed of the Plaintiffs' dissatisfaction with its special education services, Defendant Tulsa Public Schools opted to cut approximately $4.2 million from its special education budget.

243.     These cuts give rise to an inference that Tulsa Public Schools and Tulsa Public Schools decision-makers will be unable or unwilling to meet the needs of special education students.

244.    Plaintiff B.L.R., child of Plaintiffs Mike and Amy Howard, was beaten with nunchucks by another student while in his public school during school hours.

245.    Plaintiff B.L.R. was shoved by a substitute teacher, an agent or employee of Defendant Broken Arrow Public Schools, while in his public school during school hours.

246.    Plaintiff B.L.R. has his head shoved in a toilet while in his public school during school hours.

247.    Plaintiff B.L.R. was left outside by himself for an extended period of time during the school day and by an agent or employee of his public school as a means of punishing him for behavior caused by his disabilities.

248.    Plaintiff B.L.R. cried daily and stated that he wanted to kill himself due to the manner of his suffering at his public school, which is part of Defendant Broken Arrow Public Schools.

249.    Defendant Broken Arrow made no attempt to inform Plaintiffs Mike and Amy Howard of the suffering that B.L.R. went through while under their care.

250.    If he is denied the benefits of the Act, Plaintiffs Jerry and Shanna Sneed will probably have to re-enroll their son in public school.

251.    Plaintiff B.S., the child of Plaintiffs Jerry and Shanna Sneed, suffered severe emotional, mental, and physical abuse while a child in public school.

252.    If re-enrolled in public school, Plaintiff B.S. would suffer continued severe emotional, mental, and physical abuse.

253.    Plaintiff G.S., the child of Plaintiffs Russell and Stephanine Spry, was severely bullied because of his special needs while a student in public school.

254.    Plaintiff G.S. has not been bullied in his nonpublic school.

255.     If re-enrolled in public school, Plaintiff G.S. would suffer from repeated severe bullying.

256.     Plaintiff G.S. suffered academically while in public school.

257.     The special education coordinator for Defendant Jenks Public Schools recommended to Plaintiffs Russell and Stephanie Spry that Plaintiff G.S. be enrolled in nonpublic school.

258.     Plaintiff K.F., the child of Plaintiffs Tim and Kimberly Fisher, was severely bullied while a student in Jenks Public Schools.

259.     Jenks Public Schools did not once punish any of Plaintiff K.F.'s bullies. Instead, they punished Plaintiff K.F. by lecturing her and otherwise harassing her as a result of the manner of her reactions to the constant and degrading teasing and other bullying that she was made to suffer while in public school.

260.     Defendant Jenks Public Schools knows and has known for years that Plaintiff K.F. is autistic.

261.     Defendant Jenks Public Schools knows or should know that an autistic child will generally not respond the same way to constant and degrading teasing and other bullying that would a child who is not autistic.

262.     As a result of the constant teasing that Plaintiff K.F. suffered in public school, she needed to be placed on anti-depressant medication.

263.     Plaintiff K.F. did not have friends while a student in public school.

264.     Upon information and belief, Defendant Jenks Public Schools was either willfully blind to or unconcerned about Plaintiff K.F.'s emotional state while she was a student under its care.

265.    When Plaintiffs Tim and Kristin Fisher sought to transfer their daughter to an eligible nonpublic school so that she could receive a better and more effective education and would be eligible for a scholarship pursuant to the Act, Defendant Jenks Public Schools became hostile towards them.

266.    Defendant Jenks Public Schools refused to release records to Plaintiffs Tim and Kristin Fisher that the Fishers needed to comply with the terms of the Act.

267.    Defendant Jenks Public Schools refused to assist Plaintiffs Tim and Kristin Fisher as the Fishers sought a scholarship for Plaintiff K.F.

268.    When Plaintiffs Tim and Kristin Fisher contacted the office within Defendant Jenks Public Schools that is responsible for processing matters relating to the Act, rather than assisting them with the information that they needed, the Fishers were directed to contact a nonpublic school to which their records were already sent.

269.    Upon information and belief, that office of Defendant Jenks Public Schools had access to the information that the Fishers sought and withheld it from them in retaliation for seeking a scholarship.

270.    Plaintiff Marjorie Boyd-Lyons has experienced great emotional distress based on the uncertainty about whether she would be able to obtain a scholarship for her child.

271.    Plaintiff Nancy Kimery, after learning of the Act, and in good faith expectation that Defendant Broken Arrow Public Schools would comply with it, made a promise to her son that he would be able to remain in nonpublic school as long as he needs to be there.

272.    Plaintiff Nancy Kimery believes that her son, Plaintiff T.K., loves his new school and is, for the first time in a long time, a happy child.

273.     Plaintiff T.K. cried every day due to his suffering in his public school, which is maintained by Defendant Broken Arrow Public Schools.

274.     Kimery is grateful in particular that her son no longer must eat lunch in the public school lunch room that she has described as "Hell."

275.     On October 31, 2008, Plaintiffs Tim and Kimberly Tylicki received a call from Defendant Jenks Public Schools asking them to come to their son's (Plaintiff M.T.'s) school.

276.     Calls such as the one that the Tylickis received on October 31, 2008 occurred frequently because of Defendant Jenks Public Schools' inability to manage Plaintiff M.T.'s condition.

277.     After receiving that phone call on October 31, 2008, Plaintiff Tim Tylicki went to his son's school expecting to be asked to take Plaintiff M.T. home. To his surprise, he was asked to attend, without notice or prior warning, a meeting to review M.T.'s IEP.

278.     Typically, IEP review meetings are noticed in writing long before they are held.

279.     Typically, parents invited to attend an IEP meeting are informed of the subject matter likely to be discussed during the meeting.

280.     Plaintiff Tim Tylicki did not have the benefit of prior notice or the ability to review his notes and collect his thoughts on the subject matters discussed at his son's IEP review meeting.

281.     At that meeting, agents and/or employees of Jenks Public Schools informed Tylicki that from that day forward they would only be educating Plaintiff M.T. for a half-day (literally halving Plaintiff M.T.'s educational opportunities) and then threatened Tylicki by saying that if Plaintiff M.T. was unable to remain in his class at least 75% of his new reduced schedule, he would be dismissed from school and that the Tylickis would be forced to homeschool.

282.     Defendant Jenks Public Schools further informed Tylicki that in the event that they forced the Tylickis to homeschool their child, Defendant Jenks Public Schools would provide the Tylickis with a tutor for just three hours per week.

283.     Upon information and belief, Defendant Jenks believed that it could do just as good of a job educating M.T. in three hours at home using a private tutor as it did over the course of an entire week in school.

284.     Plaintiff Tim Tylicki rejected Defendant Jenks Public School's ultimatum. Plaintiff M.T. remained in his public school until leaving to take advantage of the benefits provided to him by the Act.

285.     Some of the Parent Plaintiffs may be able to afford to keep their children in a nonpublic school to provide them with the special assistance that they believe their children need. But many will have to make significant lifestyle changes in order to do so.

286.     For example, the Plaintiffs Russell and Stephanie Spry might have to sell their vehicle or vehicles and purchase cheaper ones.

287.     Plaintiffs Tim and Kimberly Tylicki might have to borrow against a life insurance policy.

288.     Plaintiffs Tim and Kristin Fisher have already taken out a bank loan to pay the portion of Plaintiff T.K.'s tuition that should be, but has not been, covered by their Henry scholarship.

289.     As alleged below, Jenks Public Schools has failed to provide Plaintiff K.F. with the entire scholarship that she is owed. If they had, Plaintiffs Tim and Kristin Fisher would have had no need to take out a bank loan.

290.     Plaintiffs Tim and Kristin Fisher previously had to sell their house to help pay for their daughter's medical bills.

291.     If Child Plaintiffs re-enrolled in public school, they would suffer from retaliation by their school districts.

292.     Plaintiff Nancy Kimery has already been retaliated against by Defendant Broken Arrow Public Schools.

293.     Plaintiff Nancy Kimery is a former educator and was offered a part time job by Defendant Broken Arrow at around the same time that she sought a scholarship under the Act for the benefit of her son.

294.     Kimery was more than qualified for the job but wanted the work and knew many of the people she would be working with from her prior employment as a teacher.

295.     Kimery was told to report to her assigned school one Wednesday morning to fill out the necessary paperwork and commence her employment.

296.     Upon information and belief, Defendant Broken Arrow Public Schools learned of Plaintiff Kimery's intent to apply for a scholarship under the Act prior to the commencement of her employment.

297.     Within a week of the day that Plaintiff Kimery was instructed to report to her assigned school, Defendant Broken Arrow Public Schools contacted Kimery to inform her that the job for which she had been hired no longer exists.

298.     Plaintiff W.J., the minor child of Plaintiffs, Curtis and Jane Johnson, has been beaten by other children while in his former public school, a school controlled by Defendant Tulsa Public Schools.

299.     Employees and/or agents of Defendant Tulsa Public Schools were present during at least one episode of physical violence against Plaintiff W.J.

300.     Employees and/or agents of Defendant Tulsa Public Schools have discouraged Plaintiff W.J. from reporting episodes of violence against him.

301.     Employees and/or agents of Defendant Tulsa Public Schools have punished Plaintiff W.J. as a result of his efforts to report episodes of violence against him.

302.     Upon information and belief, employees and/or agents of Defendant Tulsa Public Schools have never punished (whether via detention, suspension, expulsion, or any other means) the student or students for harming Plaintiff W.J. during school hours and on school grounds.

303.     Upon information and belief, any action that that Defendant Tulsa Public Schools might have taken against the student or students who harmed Plaintiff W.J. was applied against such student (the bully) and Plaintiff W.J. (the victim) equally or to the primary detriment of Plaintiff W.J.

304.     Plaintiff Jane Johnson was previously a successful engineer and is now a stay at home mom.

305.     Plaintiff Jane Johnson was compelled to leave her job as an engineer in order to tutor her son after school, due to Defendant Tulsa Public School's failure to protect Plaintiff W.J. from harm while at school, and as a result of Tulsa Public Schools' hostile posture in dealing with Plaintiffs Curtis and Jane Johnson.

306.     Plaintiff W.J. was bullied for a period of about three years while in attendance at his school .

307.     For approximately three months, Plaintiff Jane Johnson sat in her son's school playground while he was at recess to ensure her son's safety.

308.     Employees and/or agents of Defendant Tulsa Public Schools have demanded that Plaintiff W.J. be medicated in a manner inconsistent with the directions of W.J.'s physician.

309.     Upon information and belief, some of those employees and/or agents who recommended a particular medical treatment were aware that W.J.'s physician made a contrary recommendation.

310.     Upon information and belief, some of those employees and/or agents who recommended a particular medical treatment did not retract (or affirmatively repeated) their recommendation upon learning that W.J.'s physician made a contrary recommendation.

311.     Upon information and belief, those employees and/or agents who recommended a particular medical treatment were not themselves physicians.

312.     Upon information and belief, those employees and/or agents who recommended a particular medical treatment did not have sufficient medical training to qualify them to opine as they did.

313.     Upon information and belief, those employees and/or agents who recommended a particular medical treatment did so without regard for the best interests of W.J.

314.     On at least one occasion, W.J. was beaten by another student while one of his teachers watched.

315.     As a result of that incident, the school nurse called Plaintiffs Curtis and Jane Johnson to inform them of their son's condition. Curtis and Jane Johnson subsequently took Plaintiff W.J. to a physician to assess Plaintiff W.J.'s injuries.

316.     After speaking with the school nurse over the phone and hearing of their son's beating, Plaintiffs Curtis and Jane Johnson came to Plaintiff W.J.'s school. Jane Johnson, still

quite upset, needed to remain in the car until her emotions could settle. Curtis Johnson went to find the nurse and to pick up his son.

317.     Plaintiff Curtis Johnson found Plaintiff W.J. bleeding. His back, from his neck to his waist, was bruised and bloody.

318.     Meanwhile, Plaintiff Jane Johnson, still in her car, saw the school's principal literally run out of the school building. Plaintiffs Curtis Johnson and W.J. came out of the building shortly thereafter. Curtis called out to the principal to show her W.J.'s injuries.

319.     Rather than talking with Plaintiff Curtis Johnson, W.J.'s principal got in her car and drove away.

320.     Upon information and belief, W.J.'s principal left the school in an effort to avoid speaking to Plaintiffs Curtis and Jane Johnson.

321.     After another episode of severe violence against W.J. by a fellow student on school grounds and during school hours, W.J. reported the incident to his principal requesting permission to call his father.

322.     In response, not only did the principal fail to allow W.J. to use the telephone, the principal demanded that W.J. describe the incident in his own pen in a letter to the principal.

323.     The principal read W.J.'s written description, stated the principal's disapproval of the description, and demanded that W.J. write it again. When W.J. repeated the same story, his principal sent him out of the office.

324.     Plaintiffs Curtis and Jane Johnson have been repeatedly discouraged by agents and/or employees of Defendant Tulsa Public Schools from taking advantage of the Act and enrolling their child in private school.

325.     Upon learning that Curtis and Jane Johnson were considering sending W.J. to a nonpublic school pursuant to the Act, Defendant Tulsa Public Schools made two offers to the Johnson family designed to entice them not to apply for benefits under the Act.

326.     Those offers both involved considerable expense to Defendant Tulsa Public Schools over a period of many years.

327.     Upon information and belief, those offers entailed violations of the District's own rules.

328.     Defendant Tulsa Public Schools has attempted to impede Plaintiffs Curtis and Jane Johnson's efforts to take advantage of the Act.

329.     For example, Defendant Tulsa Public Schools has made it difficult for Plaintiffs Curtis and Jane Johnson to obtain teacher recommendations, which were necessary for Plaintiff W.J.'s enrollment in a nonpublic school.

330.     Similarly, upon information and belief, Defendant Tulsa Public Schools has taken efforts to alter or otherwise affect Plaintiff W.J.'s academic record.

331.     Defendant Tulsa Public Schools has no ability to effectively and safely care for Plaintiff W.J.

332.     Defendant Tulsa Public Schools has no ability to protect the Johnson family from the retaliation of the district's employees and/or agents.

333.     Defendant Tulsa Public Schools and Superintendent Ballard have adopted a policy of retaliating against the Johnsons and others who are similarly situated.

334.     Defendants' actions have forced Plaintiffs to disclose or make public previously private information about Child Plaintiffs' special needs that were previously confidential.

335.    By forcing Child Plaintiffs to make their special needs public, Defendants display a lack of concern for the best interests of the Child Plaintiffs.

336.    Defendant Tulsa Public Schools is not compliant with the requirements of No Child Left Behind, a series of federal laws and regulations.

337.    Upon information and belief, Defendant Jenks Public Schools has a history of noncompliance with disability law.

338.    Upon information and belief, there is an open complaint with the United States Department of Education regarding Defendant Jenks Public Schools' prior violations of disability law, including the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

339.    Should the Department of Education act on the complaint, it could lead to sanctions against Defendant Jenks Public Schools.

340.    Upon information and belief, Defendant Jenks Public Schools has a history of negligently exposing its students to toxic substances.

341.    Upon information and belief, Defendant Jenks Public Schools attempted to conceal the aforementioned exposure to toxic substances, demonstrating its inability to properly deal with vulnerable and trusting students, particularly those with special needs.

342.    Upon information and belief, Defendant Jenks Public Schools has a history of acting as though it is exempt from complying with state and federal law.

343.    Similarly, Defendant Broken Arrow Public Schools has been the subject of official investigations regarding its improper use of money.

344.    The Attorney General of Oklahoma recently suggested in an official report that agents and/or employees of Defendant Broken Arrow might have committed criminal violations.

345.    Upon information and belief, Defendant Broken Arrow Public Schools has acted in the past as if it were exempt from complying with state and federal law.

346.    Defendant Tulsa Public Schools has demonstrated deficiency in its reading program.

347.    Defendant Tulsa Public Schools' mathematics 2008-09 proficiency rate for special education students was 48.68%. The state target was 60.93%.

348.    Defendant Tulsa Public Schools' reading 2008-09 proficiency rate for special education students was 46.15%. The state target was 62.13%.

349.    In the school year 2008-09, only 47.62% of children in Defendant Tulsa Public Schools' program for preschool special education were performing academically on target with their peers when they turned age six or left the program. The state average was 55.0%.

350.    In the school year 2008-09, only 50.00% of children in Defendant Tulsa Public Schools' program for preschool special education were functioning within age expectations regarding their social-emotional skills when they turned age six or left the program. The state average was 54.50%.

351.    In the school year 2008-09, only 57.14% of children in Defendant Tulsa Public Schools' program for preschool special education were functioning within age expectations regarding their behavioral skills when they turned age six or left the program. The state average was 67.70%.

352.    Defendant Union Public Schools' mathematics 2008-09 proficiency rate for special education students was 59.95%. The state target was 60.93%.

353.    Defendant Union Public Schools' reading 2008-09 proficiency rate for special education students was 57.02%. The state target was 62.13%.

354.    The OSDOE graded Defendant Broken Arrow Public Schools' special education program as "Needs Assistance" for school years 2005-06 and 2006-07.

355.    The OSDOE graded Defendant Tulsa Public Schools' special education program as "Needs Assistance" for school years 2007-08.

356.    The OSDOE graded Defendant Union Public Schools' special education program as "Needs Assistance" for school years 2005-06.

F.      **The Benefits of Nonpublic Schools for Child Plaintiffs**

357.    Former Governor Brad Henry signed the Act into law the day following its passage by the legislature in 2010.

358.    Transferring to nonpublic school has been highly beneficial for all of the Child Plaintiffs.

359.    Parent Plaintiffs are all very pleased by the results they have seen from their nonpublic schools.

360.    Child Plaintiffs have progressed considerably in the few months that they have been enrolled in nonpublic school.

361.    Child Plaintiffs are progressing at a greater rate while in nonpublic school than they did while in public school.

362.    Child Plaintiffs are generally happy in nonpublic school.

363.    Child Plaintiffs were generally unhappy in public school.

364.    If Child Plaintiffs continue to progress as a result of their nonpublic education, they are more likely to become more productive citizens of the State of Oklahoma as a result of their enrollment in their nonpublic schools.

365.     The enrollment of Child Plaintiffs in nonpublic school is a significant benefit to themselves, their families, their communities, and to the entire State of Oklahoma.

366.     For example, Plaintiffs L.H. and A.J.H., the minor children of Plaintiffs Stefan and Stephanie Hipskind, improved academically shortly after enrolling in nonpublic school.

367.     Plaintiff W.J., the minor child of Curtis and Jane Johnson, reports being extremely happy in his new nonpublic school. His parents state: "He is a new child these days. He is happy, meltdowns almost nonexistent now." They further report that his life is much better as a result of withdrawing from public school and enrolling in nonpublic school.

368.     Plaintiff W.J. is being challenged academically in nonpublic school in ways that he was not while in public school. The academic challenges granted to him are enabling him to develop as a confident student. His public school did not provide him that opportunity.

369.     Plaintiff W.J.'s confidence is greater now that he is enrolled in nonpublic school. He has more friends, is happier, and is a better student.

370.     Plaintiff K.F., the minor child of Plaintiffs Tim and Kristin Fisher, feels welcome in her new nonpublic school. Unlike her experience in public school, she is happy, is not bullied, and has developed friendly relationships.

371.     Plaintiff K.F. is no longer on the anti-depressant medication that she needed to take as a result of her negative experiences in public school.

372.     Plaintiffs Mike and Amy Howard are frightened by the prospect of re-enrolling their child in public school because their son, while a public school student, was bullied severely.

373.     The interests of Child Plaintiffs are better served in their nonpublic schools than in Defendants' public schools.

G.         **Defendant School Districts' Temporary Policy Change**

374.     Defendant School Districts have all announced that they are temporarily suspending their Policies of non-compliance.

375.     On January 18, 2011, Attorney General Scott Pruitt wrote a letter to the Superintendents of Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools, and to Liberty Public Schools. The letter warned some Defendant Board Members that they risked significant legal liability for their "willful neglect or disobedience" of their duties under the Act.

376.     On January 18, 2011, Defendant Tulsa Public Schools voted to rescind its Policy of noncompliance as it related to the scholarship applications not received prior to October 18, 2010.

377.     On information and belief, this vote was not a good faith policy change, but was instead taken to avoid pressure from the Attorney General.

378.     On January 24, 2011, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools voted to temporarily stay their Policy of noncompliance while they sought an injunction against the Attorney General in state court.

379.     On January 24, 2011, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools also indicated that they would seek a declaratory judgment on the constitutionality of the Act.

380.     No such action has been filed and Defendant School Districts have not retracted their January 24 statements. As a result, Parent Plaintiffs are in limbo as they prepare for the coming school year not knowing whether the Defendant School Districts intend to comply with state law in September, 2011.

381.     Upon information and belief, Defendant School Districts have deliberately placed Parent Plaintiffs in limbo in order to retaliate against them for accepting a scholarship pursuant to the Act.

382.     Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools have colluded to assist each other violate the Act.

383.     Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools have agreed to partner in fighting the Act in court.

384.     Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools have agreed to share their assets–taxpayer dollars paid by the Parent Plaintiffs and others–to pay the legal fees of each district as they attempt to fight the Act.

385.     Upon information and belief, Defendants' efforts to comply with the Act since announcing their temporary suspensions of their policies have not been in good faith.

**H.       Defendant School Districts' Current Policy**

386.     As alleged above, Jarod Mendenhall, Kirby Lehman, Keith Ballard, and Cathy Burden have final decision-making authority for Defendants Broken Arrow Public Schools, Jenks Public Schools, Tulsa Public Schools, and Union Public Schools, respectively.

387.     Decisions and policies of Jarod Mendenhall constitute an official policy of Defendant Broken Arrow Public Schools.

388.     Decisions and policies of Kirby Lehman constitute an official policy of Defendant Jenks Public Schools.

389.     Decisions and policies of Keith Ballard constitute an official policy of Defendant Tulsa Public Schools.

390.    Decisions and policies of Cathy Burden constitute an official policy of Defendant Union Public Schools.

391.    Mendenhall, Lehman, Ballard, and Burden have all adopted, on behalf of their respective school districts, policies of non-compliance with the Act.

392.    Mendenhall, Lehman, Ballard, and Burden are indifferent to the statutory and constitutional rights possessed by the Plaintiffs.

393.    Defendant School Boards are indifferent to the statutory and constitutional rights possessed by the Plaintiffs.

394.    Upon information and belief, Mendenhall and/or other high-ranking officials within Defendant Broken Arrow Public Schools have failed to adequately train their agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

395.    Upon information and belief, Lehman and/or other high-ranking officials within Defendant Jenks Public Schools have failed to adequately train their agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

396.    Upon information and belief, Ballard and/or other high-ranking officials within Defendant Tulsa Public Schools have failed to adequately train their agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

397.    Upon information and belief, Burden and/or other high-ranking officials within Defendant Union Public Schools have failed to adequately train their agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

398.     Upon information and belief, Mendenhall and/or other high-ranking officials within Defendant Broken Arrow Public Schools have deliberately withheld proper training to those give the responsibility of carrying out the terms of the Act.

399.     Upon information and belief, Lehman and/or other high-ranking officials within Defendant Jenks Public Schools have deliberately withheld proper training to those given the responsibility of carrying out the terms of the Act.

400.     Upon information and belief, Ballard and/or other high-ranking officials within Defendant Tulsa Public Schools have deliberately withheld proper training to those given the responsibility of carrying out the terms of the Act.

401.     Upon information and belief, Burden and/or other high-ranking officials within Defendant Union Public Schools have deliberately withheld proper training to those given the responsibility of carrying out the terms of the Act.

402.     Upon information and belief, Mendenhall and/or other high-ranking officials within Defendant Broken Arrow Public Schools affirmatively instructed their agents and/or employees to take measures, whether legal or not, to minimize the scholarships paid to the Plaintiffs.

403.     Upon information and belief, Lehman and/or other high-ranking officials within Defendant Jenks Public Schools affirmatively instructed their agents and/or employees to take measures, whether legal or not, to minimize the scholarships paid to the Plaintiffs.

404.     Upon information and belief, Ballard and/or other high-ranking officials within Defendant Tulsa Public Schools affirmatively instructed their agents and/or employees to take measures, whether legal or not, to minimize the scholarships paid to the Plaintiffs.

405.      Upon information and belief, Burden and/or other high-ranking officials within Defendant Union Public Schools affirmatively instructed their agents and/or employees to take measures, whether legal or not, to minimize the scholarships paid to the Plaintiffs.

406.      Defendant Board of Education of Broken Arrow Public Schools has failed to adequately train its agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

407.      Defendant Board of Education of Broken Arrow Public Schools has failed to supervise its agents and/or employees to ensure compliance with statutory and constitutional law.

408.      Defendant Board of Education of Jenks Public Schools has failed to adequately train its agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

409.      Defendant Board of Education of Jenks Public Schools has failed to supervise its agents and/or employees to ensure compliance with statutory and constitutional law.

410.      Defendant Board of Education of Tulsa Public Schools has failed to adequately train its agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

411.      Defendant Board of Education of Tulsa Public Schools has failed to supervise its agents and/or employees to ensure compliance with statutory and constitutional law.

412.      Defendant Board of Education of Union Public Schools has failed to adequately train its agents and/or employees to enable them to effectively discharge their obligations to the Plaintiffs pursuant to the Act.

413.      Defendant Board of Education of Union Public Schools has failed to supervise its agents and/or employees to ensure compliance with statutory and constitutional law.

414.    Defendant Broken Arrow Public Schools has adopted a custom of failing to properly classify its students' disabilities.

415.    Defendant Broken Arrow Public Schools has adopted a custom of failing to properly report to the OSDOE information regarding its students' disabilities.

416.    Defendant Jenks Public Schools has adopted a custom of failing to properly classify its students' disabilities.

417.    Defendant Jenks Public Schools has adopted a custom of failing to properly report to the OSDOE information regarding its students' disabilities.

418.    Defendant Tulsa Public Schools has adopted a custom of failing to properly classify its students' disabilities.

419.    Defendant Tulsa Public Schools has adopted a custom of failing to properly report to the OSDOE information regarding its students' disabilities.

420.    Defendant Union Public Schools has adopted a custom of failing to properly classify its students' disabilities.

421.    Defendant Union Public Schools has adopted a custom of failing to properly report to the OSDOE information regarding its students' disabilities.

422.    Upon information and belief, Kirby Lehman has threatened teachers in his district to coerce them to publicly oppose the Act.

423.    Upon information and belief, other high-ranking officials of Defendant Jenks Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

424.    Upon information and belief, high-ranking officials of Defendant Broken Arrow Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

425.     Upon information and belief, high-ranking officials of Defendant Tulsa Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

426.     Upon information and belief, high-ranking officials of Defendant Union Public Schools have attempted to coerce its teachers and other staff to publicly oppose the Act.

427.     Defendant Broken Arrow Public Schools has adopted a policy of making it difficult for parents to request or receive scholarships pursuant to the Act.

428.     Upon information and belief, Defendant Broken Arrow Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

429.     Defendant Broken Arrow Public Schools has adopted a policy of minimizing scholarship payments to the Plaintiffs.

430.     Upon information and belief, Defendant Broken Arrow Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

431.     Defendant Jenks Public Schools has adopted a policy of making it difficult for parents to request or receive scholarships pursuant to the Act.

432.     Upon information and belief, Defendant Jenks Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

433.     Defendant Jenks Public Schools has adopted a policy of minimizing scholarship payments to the Plaintiffs.

434.     Upon information and belief, Defendant Jenks Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

435.     Defendant Tulsa Public Schools has adopted a policy of making it difficult for parents to request or receive scholarships pursuant to the Act.

436.     Upon information and belief, Defendant Tulsa Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

437.     Defendant Tulsa Public Schools has adopted a policy of minimizing scholarship payments to the Plaintiffs.

438.     Upon information and belief, Defendant Tulsa Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

439.     Defendant Union Public Schools has adopted a policy of making it difficult for parents to request or receive scholarships pursuant to the Act.

440.     Upon information and belief, Defendant Union Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

441.     Defendant Union Public Schools has adopted a policy of minimizing scholarship payments to the Plaintiffs.

442.     Upon information and belief, Defendant Union Public Schools will continue to exercise this policy, regardless of the 2011 statutory amendments.

443.     Parent Plaintiffs have good reason to fear that they may, without sufficient warning, cease to receive the benefits owed to them under the Act.

444.     Upon information and belief, Parent Plaintiffs will not be receiving interest on the money owed to them and held unlawfully by the Defendants.

445.     To date, Plaintiffs Curtis and Jane Johnson have not received a single scholarship payment despite that Defendant Tulsa Public Schools does not challenge their eligibility under the statute.

446.     Plaintiff W.J., the minor child of Plaintiffs Curtis and Jane Johnson, became eligible for the scholarship during the third quarter of the 2010-11 school year. The last day of the third

quarter for Tulsa Public Schools was April 1, 2011. Scholarship payments are due following the completion of the academic quarter, which makes Tulsa Public Schools approximately three months late on the their Third Quarter payment to the Johnsons.

447.    Upon information and belief, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools have stated that they anticipate to see the scholarship money that they pay out refunded to them should they defeat Oklahoma's Attorney General in litigation regarding the Act.

448.    Upon information and belief, Defendants Broken Arrow Public Schools, Jenks Public Schools, and Union Public Schools intend to seek to force Plaintiffs to repay any scholarship money paid to them under the Act if the dispute with the Attorney General is resolved in Defendants' favor.

449.    Defendant School Districts, along with Liberty Public Schools, Bixby Public Schools, and Owasso Public Schools, are the only school districts in the State of Oklahoma to announce refusal to comply with the Act.

450.    There are 541 school districts in the State of Oklahoma. Defendant School Districts, Liberty Public Schools, Bixby Public Schools, and Owasso Public Schools (a total of seven districts) comprise just 1.3% of the State's school districts.

451.    Defendant School Districts have not timely provided Plaintiffs with all of the money due to them under the Act.

452.    Upon information and belief, Defendant Broken Arrow Public Schools has attempted to persuade parents not to accept scholarships pursuant to the Act by telling them or otherwise trying to convince them that the scholarships are taxable income.

453.     Upon information and belief, Defendant Broken Arrow Public Schools has, as a condition precedent on receipt of scholarship funds, required at least one scholarship applicant to fill out tax forms.

454.     Upon information and belief, Defendant Broken Arrow Public Schools and its high-ranking officials, including Mendenhall, are aware that state law does not require them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

455.     Defendant Broken Arrow Public Schools and its high-ranking officials, including Mendenhall, have no reasonable basis upon which to conclude that federal law requires them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

456.     Upon information and belief, Defendant Broken Arrow Public Schools intends to report or has already reported to the IRS the scholarships that it has paid pursuant to the Act.

457.     Upon information and belief, Defendant Broken Arrow Public Schools intends to report or has already reported the scholarships to the IRS with the hope that the applicants will be penalized for accepting scholarships by paying more state and federal income tax.

458.     Upon information and belief, Defendant Jenks Public Schools has attempted to persuade parents not to accept scholarships pursuant to the Act by telling them or otherwise trying to convince them that the scholarships are taxable income.

459.     Upon information and belief, Defendant Jenks Public Schools has, as a condition precedent on receipt of scholarship funds, required at least one scholarship applicant to fill out tax forms.

460.     Upon information and belief, Defendant Jenks Public Schools and its high-ranking officials, including Lehman, are aware that state law does not require them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

461.     Defendant Jenks Public Schools and its high-ranking officials, including Lehman, have no reasonable basis upon which to conclude that federal law requires them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

462.     Upon information and belief, Defendant Jenks Public Schools intends to report or has already reported to the IRS the scholarships that it has paid pursuant to the Act.

463.     Upon information and belief, Defendant Jenks Public Schools intends to report or has already reported the scholarships to the IRS with the hope that the applicants will be penalized for accepting scholarships by paying more state and federal income tax.

464.     Upon information and belief, Defendant Union Public Schools has attempted to persuade parents not to accept scholarships pursuant to the Act by telling them or otherwise trying to convince them that the scholarships are taxable income.

465.     Upon information and belief, Defendant Union Public Schools has, as a condition precedent on receipt of scholarship funds, required at least one scholarship applicant to fill out tax forms.

466.     Upon information and belief, Defendant Union Public Schools and its high-ranking officials, including Burden, are aware that state law does not require them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

467.     Defendant Union Public Schools and its high-ranking officials, including Burden, have no reasonable basis upon which to conclude that federal law requires them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

468.     Upon information and belief, Defendant Union Public Schools intends to report or has already reported to the IRS the scholarships that it has paid pursuant to the Act.

469.     Upon information and belief, Defendant Union Public Schools intends to report or has already reported the scholarships to the IRS with the hope that the applicants will be penalized for accepting scholarships by paying more state and federal income tax.

470.     Defendant Tulsa Public Schools has attempted to persuade parents not to accept scholarships pursuant to the Act by telling them or otherwise trying to convince them that the scholarships are taxable income.

471.     Defendant Tulsa Public Schools has, as a condition precedent on receipt of scholarship funds, required at least one scholarship applicant to fill out tax forms.

472.     Upon information and belief, Defendant Tulsa Public Schools and its high-ranking officials, including Ballard, are aware that state law does not require them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

473.     Defendant Tulsa Public Schools and its high-ranking officials, including Ballard, have no reasonable basis upon which to conclude that federal law requires them to mandate that scholarship applicants fill out tax forms as a condition on the receipt of a scholarship.

474.     Upon information and belief, Defendant Tulsa Public Schools intends to report or has already reported to the IRS the scholarships that it has paid pursuant to the Act.

475.     Upon information and belief, Defendant Tulsa Public Schools intends to report or has already reported the scholarships to the IRS with the hope that the applicants will be penalized for accepting scholarships by paying more state and federal income tax.

476.     Tulsa Public Schools informed Plaintiffs Jane and Curtis Johnson, contrary to law and fact, that their scholarships are taxable income.

477.    Defendant Tulsa Public Schools required the Johnsons, as condition on the receipt of scholarship funds, to fill out tax forms.

478.    Defendant Tulsa Public Schools received the Form W-9 that it required–contrary to law–the Johnsons to fill out on or about May 10, 2010 via United States Postal Service Certified Mail (tracking number 7010 3090 0003 7498 9796).

479.    Defendant Tulsa Public Schools thereafter lost or misfiled the Johnsons' W-9. Based on its claim that the accounting department did not timely receive the W-9, which the department did not need to process the Johnsons' scholarship check, the accounting department illegally withheld the Johnsons' scholarship funds.

480.    Upon information and belief, Defendant Tulsa Public Schools was aware that it did not require a Form W-9 to process the Johnson's scholarship payment.

481.    Upon information and belief, Defendant Tulsa Public Schools deliberately misplaced or misfiled the W-9 in retaliation against the Johnsons for their decision to accept a scholarship pursuant to the Act.

482.    IRS Publication 970, available at http://www.irs.gov/publications /p970/ch01.html#en_US_2010_publink1000177991, which is easily searchable on Google and other internet "search engines," explicitly indicates that scholarships provided pursuant to the Act are not taxable. Specifically, it states that:

a.    Scholarships used by a "candidate for a degree" who use the money to pay for "qualified tuition expenses" are not taxable.

b.    "Candidate for a degree" is defined to include students at primary or secondary schools.

c.    "Qualified tuition expenses" is defined to include "tuition and fees required to enroll at or attend an eligible educational institution."

d.    An "eligible educational institution" is simply one that "maintains a regular faculty and curriculum and normally has a regularly enrolled body of students in attendance at the place where it carries on its educational activities."

483.    Plaintiff T.K. suffers from Asperger's syndrome, an anxiety disorder, a speech disorder, a sensory processing disorder, and other developmental issues.

484.    The Kimerys, the parents of Plaintiff T.K., learned in February 2011 that their scholarship for T.K. will be just approximately $4000 per year because Broken Arrow reported Plaintiff T.K. as having only a speech disorder.

485.    Upon information and belief, Defendant Broken Arrow Public Schools reduced or caused the reduction of Plaintiff T.K.'s scholarship to retaliate against Plaintiffs Donald and Nancy Kimery for claiming a scholarship pursuant to the Act.

486.    The Kimerys learned from OSDOE in February 2011 that if Defendant Broken Arrow had reported T.K.'s Asperger's syndrome, they would have received approximately $12,000 per year.

487.    The Kimerys forwarded to Defendant Broken Arrow Public schools a signed psychologist's report in December 2008 stating that Plaintiff T.K. has "pervasive developmental disorder," a condition on the autism spectrum.

488.    By December 2008, Defendant Broken Arrow was either aware of or willfully blind to Plaintiff T.K.'s autism.

489.     The Kimerys forwarded to Defendant Broken Arrow Public schools two signed medical reports (one from a psychologist, the other from a psychiatrist) in May 2011. Both of those reports indicate that Plaintiff T.K. has Asperger's Disorder.

490.     The Kimerys learned from OSDOE in February 2011 that Defendant Broken Arrow was obligated by federal law to inform them of their right to an IEP re-evaluation in October 2010.

491.     On information and belief, the October 2010 IEP re-evaluation that never was would have necessitated that Defendant Broken Arrow add Plaintiff T.K.'s other conditions to his IEP.

492.     The Kimerys learned from OSDOE in February 2011 that Defendant Broken Arrow could have, but neglected to include in their report to OSDOE, Plaintiff T.K.'s occupational therapy and certain other services. The Kimerys also learned that if Defendant Broken Arrow had correctly reported the services to which Plaintiff T.K.'s is entitled, the Kimerys would have received a greater scholarship.

493.     Upon information and belief, Defendant Broken Arrow Public Schools changed Plaintiff T.K.'s information in OSDOE's system, changed their internal records, or omitted in their report to OSDOE some of the details of T.K's condition, resulting in a reduced calculation by OSDOE.

494.     On or about April 5, 2011, the Kimerys learned from Defendant Broken Arrow that any future IEP reevaluations will have no affect on future scholarship payments.

495.     Defendant Broken Arrow's declaration that it will not increase scholarship payments in the future that result from a revised IEP has no support in the Act or other law.

496.     Defendant Broken Arrow's policy of not increasing scholarship payments regardless of the results of future IEP reevaluations applies even when it is at fault for an improper, ineffective, or insufficient initial evaluation.

497.     On May 27, 2011, Defendant Broken Arrow Public Schools finally reviewed Plaintiff T.K.'s IEP, approximately seven months too late.

498.     During the May 27, 2011 IEP review, Defendant Broken Arrow announced, after reviewing medical reports that were first sent to Defendant Broken Arrow in December 2008, that Plaintiff T.K. has developmental delay with suspected autism and that he will be regarded as having autism upon his ninth birthday.

499.     The statutory amendments to the Act were signed into law on May 26, 2011, one day prior to Plaintiff T.K.'s IEP review.

500.     Upon information and belief, Defendant Broken Arrow found Plaintiff T.K. to be autistic in response to the aforementioned statutory amendments, which took much authority over the statute away from them and subjected them to potential sanctions by the state.

501.     Upon information and belief, Defendant Broken Arrow Public Schools found Plaintiff T.K. to be autistic in the hope of avoiding administrative sanction.

502.     Defendant Broken Arrow Public Schools' sudden "compliance" following the passage of the statutory amendments suggests that its prior actions were taken in bad faith.

503.     Upon information and belief, Defendants have altered or intend to alter some of the Plaintiffs' records and submit to OSDOE misleading reports in order to reduce the scholarships paid to those Parent Plaintiffs.

504.     Plaintiffs Donald and Nancy Kimery received, on or about March 4, 2011, notice that their "maximum scholarship" calculation is approximately $4357.

505.    As noted, this maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff T.K.'s conditions.

506.    Plaintiffs Tim and Kristen Fisher received notice that their "maximum scholarship" calculation is approximately $3890.

507.    These maximum scholarship calculations are inaccurate for they fail to take into account all of Plaintiff's K.F.'s conditions.

508.    Plaintiff K.F.'s IEP expressly indicates that she has autism.

509.    Had Jenks Public Schools properly reported Plaintiff K.F.'s autism to the OSDOE, her scholarship would have been much greater and would have covered all or nearly all of her tuition.

510.    Plaintiffs Stefan and Stephanie Hipskind received on approximately February 23, 2011 notice that their "maximum scholarship" calculation is approximately $4000 for their son, Plaintiff A.J.H. and approximately $7000 for their son, Plaintiff L.H.

511.    These maximum scholarship calculations are inaccurate for they fail to take into account all of Plaintiff A.J.H.'s conditions and all of Plaintiff L.H.'s conditions.

512.    Upon information and belief, Defendant Union Public Schools has reduced or caused the reduction of Plaintiff A.J.H's scholarship and Plaintiff L.H.'s scholarship to retaliate against Plaintiffs Stefan and Stephanie Hipskind for claiming a scholarship pursuant to the Act.

513.    Plaintiffs Mike and Amy Howard received on approximately March 6, 2011 notice that their "maximum scholarship" calculation is approximately $7096.

514.    This maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff B.LR.'s conditions.

515.    Upon information and belief, Defendant Broken Arrow Public Schools has reduced or caused the reduction of Plaintiff B.L.R.'s scholarship to retaliate against Plaintiffs Mike and Amy Howard for claiming a scholarship pursuant to the Act.

516.    Plaintiffs Curtis and Jane Johnson received notice on approximately March 26, 2011 notice that their "maximum scholarship" calculation is approximately $11,680.

517.    Neither Plaintiffs Curtis and Jane Johnson nor St. Pius X Catholic School, their child's nonpublic school, have received a scholarship check on behalf of Plaintiff W.J.

518.    Plaintiffs Jerry and Shanna Sneed received on approximately March 1, 2011 notice that their "maximum scholarship" calculation is approximately $4390.

519.    This maximum scholarship calculation is inaccurate for it fails to take into account all of Plaintiff B.S.'s conditions.

520.    Upon information and belief, Defendant Union Public Schools has reduced or caused the reduction of Plaintiff B.S.'s scholarship to retaliate against Plaintiffs Jerry and Shanna Sneed for claiming a scholarship pursuant to the Act.

521.    Plaintiffs Russell and Stephanie Spry received on approximately February 28, 2011 notice that their "maximum scholarship" calculation is approximately $10,000.

522.    Plaintiffs Tim and Kimberly Tylicki received on approximately February 11, 2011 notice that their "maximum scholarship" calculation is approximately $11,360.

523.    On information and belief, Defendant School Districts' failure to act on their January 24, 2011 declaration of intent to sue their Attorney General for a declaratory judgment on the constitutionality of the Act is motivated by a desire to retaliate against, prejudice, or otherwise injure the Plaintiffs as a result of excessive delay.

524.     Defendants' actions have caused damages to Plaintiffs in an amount to be determined at trial.

## COUNT I
### Violation of the United States Constitution
### First Amendment: Free Exercise
### (42 U.S.C. § 1983)

525.     Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to their free exercise of religion—as secured by the Fourteenth Amendment to the United States Constitution—by denying Plaintiffs, based upon their religious status or sincerity, the right to funding guaranteed by state statute, by discriminating against them on the basis of their religious views or religious status, and by singling out religious practice for discriminatory treatment.

## COUNT II
### Violation of the United States Constitution
### Fourteenth Amendment: Equal Protection
### (42 U.S.C. § 1983)

526.     Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by the Fourteenth Amendment to the United States Constitution—by denying Plaintiffs, on the basis of the suspect classification of religion, the right to funding guaranteed by state statute, and by discriminating against them on the basis of religion.

## COUNT III
### Violation of the United States Constitution
### Fourteenth Amendment: Equal Protection
### (42 U.S.C. § 1983)

527.     Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by the Fourteenth

Amendment to the United States Constitution—by discriminating against them on the basis of the disabilities of their children without rational basis.

## COUNT IV
### Violation of the United States Constitution
### Fourteenth Amendment: Due Process
### (42 U.S.C. § 1983)

528.      Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to property without due process of law by refusing to honor their entitlement to funding granted by a state law that places substantive limitations on official discretion, thus denying Plaintiffs property guaranteed to them without due process of law.

## COUNT V
### Violation of the United States Constitution
### Fourteenth Amendment: Due Process
### (42 U.S.C. § 1983)

529.      Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to liberty without due process of law by denying them the rights guaranteed to them by duly enacted law for exercising their constitutional right to direct the upbringing and education of their children, and by impermissibly interfering with their liberty to direct the upbringing and education of their children.

## COUNT VI
### Violation of the United States Constitution
### First and Fourteenth Amendments: Freedom of Speech
### (42 U.S.C. § 1983)

530.      Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to free speech by discriminating against them on the basis of viewpoint as expressed through their decision to attend a nonpublic school.

## COUNT VII
### Violation of Americans with Disabilities Act, Title II
### (42 U.S.C. § 12133)

531.     Defendants, government entities acting under color of state law, have discriminated against and threaten to continue to discriminate against Child Plaintiffs by denying them access to public aid designated to accommodate their respective disabilities and excluding them from the benefits of a public program by reason of their disabilities.

## COUNT VIII
### Violation of Rehabilitation Act of 1973, Section 504
### (29 U.S.C. § 794a)

532.     Defendants, recipients of federal financial assistance, have discriminated against and threaten to continue to discriminate against Child Plaintiffs by denying them access to public aid designated to accommodate their respective disabilities and excluding them from the benefits of a public program by reason of their disabilities.

## COUNT IX
### Violation of Oklahoma Constitution
### Article 2, Section 7: Due Process

533.     Defendants have deprived and threaten to continue to deprive Plaintiffs of their right to property without due process of law by refusing to honor their entitlement to funding granted by a state law that places substantive limitations on official discretion, thus denying Plaintiffs property guaranteed to them without due process of law.

## COUNT X
### Violation of Oklahoma Constitution
### Article 2, Section 7: Equal Protection
### Discrimination on the basis of religious belief

534.     Defendants have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by Article 2, Section 7 of the Oklahoma

Constitution—by discriminating against them on the basis of the disabilities of their children without rational basis

## COUNT XI
### Violation of Oklahoma Constitution
### Article 2, Section 7: Equal Protection
### Discrimination on the basis of disability

535.     Defendants, acting under color of state law, have deprived and threaten to continue to deprive Plaintiffs of their right to equal protection of the laws—as secured by Article 2, Section 7 of the Oklahoma Constitution—by discriminating against them on the basis of the disabilities of their children without rational basis

## COUNT XII
### Violation of the School Code of 1971, Article V
### OKLA. STAT. tit. 70, § 5-101, *et seq.*
### (OKLA. STAT. tit. 70, § 5-117)

536.     Defendants have exceeded the powers granted to them by the statutes of the State of Oklahoma, which authorizes them to make rules "not inconsistent with the law." Their *ultra vires* actions have harmed and threaten to continue to harm Plaintiffs. Those actions are illegal and invalid.

## COUNT XIII
### Violation of the School Code of 1971, Article XIII
### OKLA. STAT. tit. 70, § 13-101.1, *et seq.*
### (OKLA. STAT. tit. 70, § 13-101.2)

537.     Defendants abdicated and ignored their obligations created by the Act, a duly enacted statute of the State of Oklahoma, as in force at the time of the aforementioned allegations, which required (without the opportunity to exercise any discretion) school districts to verify student enrollment in qualified nonpublic schools and thereafter, following the conclusion of each quarter of the school year, issue scholarship checks. Rather than comply with these obligations, the Defendants have retaliated against Plaintiffs, made it difficult or impossible for

the Plaintiffs to exercise their rights, and unlawfully withheld money or unlawfully delayed the

transfer of money owed to the Parent Plaintiffs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(1)   a declaration that Defendants' actions have violated and continue to violate the United

States and Oklahoma Constitutions, and state and federal statutes;

(2)   a permanent injunction requiring Defendants to comply with the law;

(3)   compensatory damages;

(4)   costs and attorney's fees; and

(5)   such other further legal or equitable relief that this Court may deem appropriate.


Dated: June 30, 2011                    Respectfully submitted,

      /s Meir Katz
Meir Katz (admitted pro hac vice)
      DC Bar Number 995431
Eric Rassbach (admitted pro hac vice)
      DC Bar Number 493739
The Becket Fund for Religious Liberty
3000 K. St., NW, Suite 220
Washington, DC 20007
Phone: 202-955-0095
Fax: 202-955-0090
mkatz@becketfund.org

John Michael Thetford
Laizure & Thetford, PLLC
P. O. BOX 701110
Tulsa, OK 74170-1110
Phone: 918-749-0749
Fax: 918-747-0751
jthetford@stipelawtulsa.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2011, I electronically transmitted the attached pleading to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

     J. Douglas Mann
     Frederick J. Hegenbart
     Jerry Alan Richardson
     Karen L. Long

Date: June 30, 2011

                                  /s Meir Katz
                                  Meir Katz